**Arthur Frederick GOODE, III, Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, Respondent-Appellee.**

No. 82–5244.

United States Court of Appeals, Eleventh Circuit.

May 2, 1983.

Rehearing and Rehearing En Banc Denied June 15, 1983.

Wilbur C. Smith, III, Fort Myers, Fla., for petitioner-appellant.

Charles Corces, Jr., Asst. Atty. Gen., Tampa, Fla., for respondent-appellee.

Before GODBOLD, Chief Judge, ANDERSON, Circuit Judge and HOFFMAN *, District Judge.

* Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting by designation.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant Arthur F. Goode, III is a Florida prisoner under the sentence of death. He seeks habeas corpus relief pursuant to 28 U.S.C.A. § 2254 (West 1977). The district court denied any relief. We affirm in part, reverse in part, and remand.

## HISTORY OF THE CASE

■ Goode was found guilty by a jury of the gruesome killing of Jason Verdow, a boy ten years of age. Goode was convicted of first degree murder and sentenced to death. On direct appeal, the Florida Supreme Court affirmed the conviction and sentence. *Goode v. State,* 365 So.2d 381 (Fla.1978), *cert. denied,* 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979). Goode then filed a motion to vacate the judgment and sentence pursuant to Fla.R.Crim.P. 3.850, alleging various constitutional violations in the guilt and penalty phases of his trial. The Florida Supreme Court affirmed the denial of this motion. *Goode v. State,* 403 So.2d 931 (Fla.1981). During this time, Goode joined with others in filing in the Florida Supreme Court a habeas action, alleging that the Florida Supreme Court had improperly received and considered extra-record materials in deciding the petitioners' direct appeals from their convictions and death sentences. The Florida Supreme Court denied relief. *Brown v. Wainwright,* 392 So.2d 1327 (Fla.), *cert. denied,* 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981). Goode then filed another habeas action in the Florida Supreme Court, alleging ineffective assistance of appellate counsel on his direct appeal. The Florida Supreme Court denied relief. *Goode v. Wainwright,* 410 So.2d 506 (Fla.1982). Goode filed the instant petition for writ of habeas corpus in federal district court. The district court dismissed the petition, granted a

certificate of probable cause for appeal, but denied a motion for a stay of execution pending appeal. This court granted Goode's motion for a stay of execution. *Goode v. Wainwright,* 670 F.2d 941, 942 (11th Cir.1982). After delaying decision in this case pending the decision in our en banc case, *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983), we now consider the merits of Goode's appeal.[1]

## ISSUES

The case presents eight issues: (1) Goode's competence to stand trial, (2) Goode's competence to waive trial counsel, (3) Goode's waiver of his right to trial counsel, (4) the trial court's general conduct of the trial, (5) the jury instructions concerning mitigating circumstances, (6) the trial court's failure to recite certain statutory and nonstatutory mitigating circumstances, (7) the Florida Supreme Court's alleged receipt and consideration of extra-record materials in deciding Goode's direct appeal, and (8) the trial court's alleged consideration of a nonstatutory aggravating factor in sentencing Goode to death.

After careful consideration, we reject the first seven claims asserted by Goode, but we find merit in the final claim and accordingly reverse.

## I. COMPETENCE TO STAND TRIAL

Goode contends that the pretrial hearing on his competence to stand trial was inadequate. He argues that a more in-depth analysis of his mental condition was needed, including more tests, long-term observations, and follow-up examinations. We conclude that the pretrial competency hearing was adequate.

If a bona fide doubt exists as to the defendant's competence to stand trial, the defendant has a due process right to a

---

1. Not all of Goode's claims have been exhausted in state court. The district court here rendered its decision two months before *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), was decided. We do not need to address whether *Rose*'s exhaustion requirements apply retroactively in this case, see

*Johnson v. Balkcom,* 695 F.2d 1320 (11th Cir. 1983), because the state has waived the exhaustion issue by failing to raise it. *Lamb v. Jernigan,* 683 F.2d 1332, 1335 n. 1 (11th Cir. 1982) (decided after *Rose*), *cert. denied,* —— U.S. ——, 103 S.Ct. 1276, 74 L.Ed.2d —— (1983).

hearing on that issue. *Reese v. Wainwright,* 600 F.2d 1085, 1091 (5th Cir.), *cert. denied,* 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979);[2] *Pedrero v. Wainwright,* 590 F.2d 1383, 1387 (5th Cir.), *cert. denied,* 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979); *Davis v. Alabama,* 545 F.2d 460, 464 (5th Cir.), *cert. denied,* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977); *see Drope v. Missouri,* 420 U.S. 162, 172–73, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975) (approving state law requirement of "reasonable cause to believe" defendant incompetent); *Pate v. Robinson,* 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966) (approving state law requirement of "bona fide doubt" as to competence). The test for competence to stand trial is whether the defendant has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding, and whether the defendant possesses a rational and factual understanding of the proceedings against him. *Drope v. Missouri,* 420 U.S. at 172, 95 S.Ct. at 904 (1975); *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960); *Pride v. Estelle,* 649 F.2d 324, 326 n. 4 (5th Cir. June 30, 1981); *Reese v. Wainwright,* 600 F.2d at 1090–91.

■ At Goode's competency hearing, four psychiatrists testified. Three of them had been appointed by the trial court, and one obtained by Goode. The three appointed psychiatrists explicitly testified that, in their opinions, Goode met the test for competence to stand trial. Goode's psychiatrist testified that he did not meet the test. The three appointed psychiatrists filed written reports with the trial court, while Goode's psychiatrist detailed his findings in his testimony. Each of the psychiatrists interviewed Goode personally.[3] Each read at least the relevant parts of an exhaustive, 187-page report on Goode's educational, psychological, familial, and criminal background, which was completed less than a year before Goode's Florida trial. The psychiatrists were satisfied that they had sufficient information to reach an opinion as to Goode's competence. Under these circumstances, we hold that Goode received an adequate hearing on the issue of his competence to stand trial.

## II. COMPETENCE TO WAIVE TRIAL COUNSEL

Goode contends that the trial court improperly failed to conduct a separate hearing on his competence to waive trial counsel, in addition to the hearing on his competence to stand trial. Goode also argues that the test for competence to waive counsel differs from the test for competence to stand trial, and that the trial court applied the wrong test. We conclude that the trial court conducted an adequate inquiry into Goode's competence to waive counsel under the very test urged by Goode.

■ Contrary to Goode's assertions, the trial court was not required to conduct a separate and distinct hearing on Goode's competence to waive trial counsel. In *Westbrook v. Arizona,* 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966), the Supreme Court observed that

Although petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing *or inquiry* into the issue of his competence to waive his constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense.

*Id.* (emphasis added).

Three of the four psychiatrists specifically addressed Goode's desire to discharge his

---

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business of September 30, 1981. *Id.* at 1209.

**3.** Dr. Barnard, the psychiatrist called by Goode's attorneys, had conducted a lengthy examination of Goode and had made a compre-

hensive evaluation. Each of the three court-appointed psychiatrists examined Goode twice. Dr. Than's first examination took about three and a half hours; his second about two and a half hours. Dr. Haber's first examination was extensive, and his second took about two hours. Dr. Wald also examined Goode twice and was satisfied that he had adequate information upon which to base his opinion.

attorney and represent himself. The trial court itself questioned one of the psychiatrists as to whether Goode's desire to waive his right to trial counsel and to represent himself was a "rational, logical judgment" that was not "substantially affected by any mental illness or mental disorder." The trial court also asked the psychiatrist whether Goode would be able to "comprehend and understand the significance" of the M'Naghten Rule, which relates to the insanity defense. Further, the trial court asked

> If I explained to him [Goode] trial tactics, his right to remain silent, for instance, the right of defense of insanity, how it's presented, how it could be used, both tactically and factually, could he understand and appreciate what I as the Judge or a lawyer were telling him?

Trial Transcript at 917, *Florida v. Goode,* No. 76–671 (Fla.Cir.Ct.1977) [hereinafter cited as Trial Transcript]. Essentially, the trial court inquired into whether Goode's mental condition permitted him to make an informed judgment as to whether he should waive his right to counsel, and as to how to conduct his own defense. The psychiatrist responded affirmatively to all of the trial court's questions. In our view, the trial court here conducted an adequate inquiry into Goode's competence to waive trial counsel.

■ Goode also argues that the trial court did not apply the proper test in determining whether Goode was competent to waive trial counsel. According to Goode, the test is as follows;

> [W]hether [the defendant] has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.

*Rees v. Peyton,* 384 U.S. 312, 314, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583 (1966). We need not and do not decide whether the *Rees* test, which related to a defendant's desire to withdraw his petition for certiorari, applies to the issue of competence to waive counsel.

Assuming *arguendo* that the *Rees* test does apply here, we fail to understand Goode's complaint. The trial court in fact applied the very test urged by Goode. As discussed earlier, the trial court questioned one of the psychiatrists as to whether Goode's desire to waive trial counsel was a rational, logical judgment not substantially affected by any mental disorder. In addition, the trial court asked whether Goode was able to comprehend and understand the significance of the proceedings, especially his various fundamental constitutional rights. In our view, this questioning indicates that the trial court adequately determined that Goode had the capacity to make a rational choice and that his decision to waive counsel was not substantially affected by any mental deficiency. Accordingly, we reject Goode's argument that the trial court did not apply the proper standard.

## III. WAIVER OF TRIAL COUNSEL

■ Goode contends that the trial court improperly concluded that Goode knowingly and intelligently waived his right to trial counsel. This issue is different from the issue of Goode's competence to waive trial counsel, in that it focuses on the circumstances of the waiver itself, once competency has been established. We conclude that Goode knowingly and intelligently waived his right to trial counsel.

In support of his argument, Goode relies on *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), in which the Supreme Court recognized that a criminal defendant has a Sixth Amendment right to self-representation. Acknowledging that the exercise of such right involves the relinquishment of the obvious benefits of trial counsel, the Supreme Court held that a defendant desiring to represent himself must knowingly and intelligently waive his right to counsel. *Id.* at 835, 95 S.Ct. at 2541; *accord, Brown v. Wainwright,* 665 F.2d 607, 610 (Former 5th Cir.1982) (full

bench en banc);[4] *United States v. Chaney,* 662 F.2d 1148, 1152 (5th Cir. Dec. 7, 1981) (Unit B).

First, contrary to his assertions, Goode "clearly and unequivocally" stated to the trial court that he wanted to represent himself and that he did not want representation by counsel. Second, Goode was adequately made aware of the "dangers and disadvantages" of self-representation. Goode was fully aware that his conviction could result in the death sentence. The trial court's manner of impressing the dangers of self-representation on Goode was to ask him a series of technical legal questions, pertinent to Goode's case, and concerning the elements of first degree murder in Florida, the voir dire examination of jurors, the purpose of opening and closing arguments, the order of proof in a criminal trial, and the method of presenting testimony.[5] After Goode repeatedly responded that he did not understand these questions, the trial judge informed him that his lack of understanding was the reason why he needed an attorney to explain these points to him. The trial judge further stated to Goode that an attorney's obligation is to advise a defendant what the law is.

The clear import of this exchange between Goode and the trial court, as in *Faretta,* was to warn Goode that it was a mistake not to accept the assistance of counsel, and also that Goode would be required to follow the "ground rules" of trial procedure. 422 U.S. at 835–36, 95 S.Ct. at 2541. Finally, as in *Faretta,* the record affirmatively demonstrates that Goode was competent and understanding and that Goode "voluntarily exercised his informed free will." *Id.* at 835, 95 S.Ct. at 2541. In addition, we note that, although Goode desired to represent himself, the trial court, in an abundance of caution, appointed standby counsel, who, at various points during the trial, advised Goode on how to proceed and conducted significant portions of Goode's defense. *See id.* at 834 n. 46, 95 S.Ct. at 2541 n. 46 (state may appoint standby counsel, even over accused's objection).

Accordingly, we hold that Goode knowingly and intelligently waived his right to trial counsel.

## IV. GENERAL CONDUCT OF THE TRIAL

■ Goode contends that his fundamental due process right to a fair trial was denied by the trial court's alleged general mismanagement of the trial proceedings. Goode points to several aspects of his trial in this regard, including the pretrial publicity, the trial court's denial of a change of venue, the hybrid form of representation whereby both Goode and his standby counsel were involved in his defense, the press coverage during the trial (the jury was not sequestered), and Goode's mid-trial press conference in which he confessed to the murder. After a careful review of the record, we reject Goode's challenge.

We have reviewed the evidence in the record concerning the pretrial publicity and the voir dire. We are satisfied from the voir dire record that no bias or prejudice from pretrial publicity entered the jury room. Although most of the jurors had read or heard about the case, either they had read about it only at the time of the crime almost a year earlier, or their recollection of the publicity was vague, or the record otherwise suggests that the publicity had very little influence. Thus, we conclude that the pretrial publicity did not deny Goode a fundamentally fair trial.

■ We have grave doubts concerning the wisdom of permitting Goode to conduct a press conference during a recess on the

---

**4.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all of the post-September 30, 1981, decisions of the full bench of the former Fifth Circuit or of Unit B. *Id.* at 34.

**5.** Although these questions were sufficient to impress upon Goode the value of legal representation and the dangers of self-representation, we note that "technical legal knowledge, *as such,* [is] not relevant to an assessment of [a defendant's] knowing exercise of the right to defend himself." *Faretta v. California,* 422 U.S. at 836, 95 S.Ct. at 2541 (emphasis added).

first day of the trial, especially because the jury was not sequestered. However, the trial judge did give the jury forceful instructions not to talk about the case with anyone, not to permit anyone to talk to them, and most significantly, not to read, listen to or watch any news reports of the trial. Nothing in the record suggests that any juror disobeyed these instructions; nothing in the record suggests that any juror even knew of or was influenced by Goode's news conference. Moreover, there is affirmative evidence in the record that the jury did in fact comply with the judge's instructions not to read, listen to, or watch any news accounts. An article appeared in the morning paper of March 16, 1977. The trial judge asked if any of the jurors had read or heard any news accounts, and received a negative response. We cannot conclude that the press coverage during the trial or Goode's press conference rendered the trial fundamentally unfair.

■ Goode complains that the hybrid form of representation, whereby both Goode and his appointed counsel participated in the defense, created confusion at the trial and prejudice. Contrary to Goode's argument, the record demonstrates that the conduct of the trial was orderly and nonprejudicial. Goode was afforded his constitutional right of self-representation in a context in which he had readily available the assistance of competent trial counsel. In fact, the two appointed public defenders conducted most of the trial in traditional fashion with Goode's apparent consent. The principal departures from tradition were first, the fact that Goode retained a right to approve trial decisions on a continuing basis, and second, the fact that Goode himself cross-examined witnesses and made a short closing argument. Goode's personal participation was, with one exception, orderly and respectful. The single exception occurred following the testimony of Billy Arthes, the 11 year old boy who testified that he was in Goode's company for several days shortly after Jason Verdow's murder and who testified that Goode told him that he, Goode, had killed Verdow. After Arthes' testimony was complete, Goode handed him a piece of candy and said: "I love you, Billy. Good bye." The trial judge's handling of the matter was forceful, effective and appropriate. He called a recess for coffee, and forcefully reprimanded Goode out of the presence of the jury. There is no indication in the record that the jury was even aware of the trial judge's displeasure. The judge's warnings to Goode were obviously effective because Goode's actions thereafter were unobjectionable. During the hearing on the motion for a new trial, the trial judge described Goode's conduct at the trial and the foregoing incident as follows:

> [H]is questions were pertinent, and excepting one incident he was very proper and gentlemanly in the courtroom, and there was a courtroom-type atmosphere ... and I am further satisfied in regard to that one incident that he was competent and wanted to do it and did it.

Trial Transcript, at 1294–95.

Without question, it is out of the ordinary for a defendant to participate as co-counsel in his own defense. However, *Faretta v. California, supra,* specifically sanctions such participation. Goode's conduct in this particular case, as the trial judge found, was entirely appropriate with one fleeting and relatively minor exception.

■ The more significant factor rendering this case unusual is the fact that Goode, although he declined to plead guilty, systematically and cleverly brought out evidence to assure his own conviction, testified in gory detail as to his guilt, and argued to the jury that he should be convicted and sentenced to death. We have carefully pondered this disturbing feature. However, we are not prepared to hold that a defendant who confesses guilt, but is unwilling to enter a guilty plea, is not entitled to a trial. Viewed from another perspective, to so hold would provide a shield from conviction for anyone who confesses guilt, but declines to plead guilty. Moreover, in a death penalty case, as here, there can be no consent judgment of death. Therefore, even if Goode had entered a guilty plea, there would still

have to be a trial to determine the sentence. Our conclusion that there is no per se obstacle to a trial, where the defendant confesses his guilt and affirmatively seeks a jury verdict of guilty, is supported by the instant case. Despite its peculiar character, the trial was conducted in an atmosphere of order and dignity.

For the foregoing reasons, we conclude that the general conduct of the trial did not deprive Goode of his due process right to a fundamentally fair trial.[6]

## V. JURY INSTRUCTIONS ON MITIGATING CIRCUMSTANCES

Goode contends that in the sentencing phase of his trial, the trial court's instructions improperly restricted the jury's consideration of mitigating circumstances to those statutory mitigating circumstances enumerated in Fla.Stat.Ann. § 921.141(6)

(West Supp.1982).[7] The State responds that Goode's argument is barred from federal habeas review by Goode's failure to object to the jury instructions at trial.[8] We agree with the State.

Under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the failure to make a contemporaneous objection, when required by state procedural rules, generally bars federal habeas review, absent a showing of both cause and prejudice.[9] The parties concede that Goode did not comply with Fla.R.Crim.P. 3.390(d) (West 1977), which requires a contemporaneous objection to allegedly erroneous jury instructions. Goode argues only that his failure to object *at trial* is excused for "cause" under *Sykes,* because *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), was not decided until after Goode was sentenced. Because *Sykes* re-

**6.** While we conclude that the unusual feature of Goode's attempt to convict himself and to assure his own death sentence do not render the trial fundamentally unfair, we acknowledge these as facts raising serious doubts as to Goode's competence. However, the psychiatrists who examined Goode were forewarned of Goode's intentions, and took them into consideration in evaluating his competence. Three of the four examining psychiatrists nevertheless found Goode to be competent. After full, fair and adequate hearing, the state trial judge found that Goode was competent. We agree with that finding.

**7.** The trial court's instructions provide, in pertinent part:

The aggravating circumstances which you may consider are limited to such of the following as may be established by the evidence ... [the aggravating circumstances were then read, along with some definitions of terms].
Those are the aggravating circumstances
. . . .
Should you find sufficient of these aggravating circumstances to exist, it will then be your duty to determine whether or not sufficient mitigating circumstances exist to outweigh the aggravating circumstances found to exist. The mitigating circumstances which you may consider, if established by the evidence, are these: ... [the seven statutory mitigating circumstances were then read].
Those are the mitigating circumstances.
Aggravating circumstances must be established beyond a reasonable doubt before they may be considered by you in arriving at your

decision. Proof of an aggravating circumstance beyond a reasonable doubt is evidence by which the understanding, judgment and reason of the jury are well satisfied and convinced to the extent of having a full, firm and abiding conviction that the circumstance has been proved to the exclusion of and beyond a reasonable doubt.
Evidence tending to establish such an aggravating circumstance which does not convince you beyond a reasonable doubt of the existence of such circumstance at the time of the events should be wholly disregarded.
If one or more aggravating circumstances are established, you should consider all the evidence tending to establish one or more mitigating circumstances and give that evidence such weight as you feel it should receive in reaching your conclusion as to the sentence which should be imposed.
Trial Transcript, at 1248–55.

**8.** The State also argues that there was a second procedural default, i.e. Goode's failure to raise the limitation on mitigating circumstances issue on direct appeal. We need not address this issue since we agree with the State that Goode's federal habeas review of this issue is barred by his procedural default at trial.

**9.** With respect to other issues discussed in this opinion, the State has waived *Sykes* objections by failing to raise them. *Washington v. Watkins,* 655 F.2d 1346, 1368 (5th Cir. Sept. 14, 1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). For example, see note 25, *infra.*

quires a showing of both cause *and* prejudice, and because we conclude that Goode has failed to satisfy the prejudice prong, we need not determine whether the cause prong has been met. *Ford v. Strickland,* 696 F.2d 804, 812 (11th Cir.1982) (en banc).

■ The instant case is controlled by *Ford v. Strickland, supra.* There the en banc court addressed the prejudicial effect of a jury instruction limiting mitigating circumstances, which closely parallels the instruction in this case. As an alternative ground for decision, Judge Roney and five other judges (Judges Hill, Fay, Vance, Johnson and Henderson) joined Chief Judge Godbold's concurring opinion in concluding that Ford had failed to establish that the instructional error worked to his *actual and substantial disadvantage* as required by *United States v. Frady,* 456 U.S. 152, 171, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816, 832 (1982). Even assuming that the jury did not consider the proffered evidence of nonstatutory mitigating circumstances, the en banc court held: "[T]hat evidence is unpersuasive. Using the *Frady* test, I cannot conclude that there is 'a substantial likelihood that the erroneous ... instructions prejudiced [the defendant's] chances with the jury.'" *Ford v. Strickland,* 696 F.2d at 822 (Godbold, C.J., dissenting in part and specially concurring in part) (quoting from *United States v. Frady,* 456 U.S. 174, 102 S.Ct. at 1597–98, 71 L.Ed.2d at 834). The court considered unpersuasive the testimony that Ford's father had been a belligerent alcoholic during his childhood, Ford's assumption of paternal responsibilities for his younger siblings, and his work during and after high school to provide support for the family. *Id.* 696 F.2d at 861 (Kravitch, J., concurring in part and dissenting in part).

We consider the evidence of nonstatutory mitigating circumstances in this case to be even less persuasive than that in *Ford.* Thus we are satisfied that there was no actual prejudice to Goode. The only evidence suggested by counsel for Goode which might qualify as nonstatutory mitigating evidence is evidence that Goode cooperated with the police and the prosecution.[10] Reply Brief of Appellant at 17–18. Our conclusion is supported by the fact that standby counsel for Goode during closing argument at the sentencing phase expressly presented only three mitigating circumstances, Goode's young age of 22, Goode's mental or emotional disturbance, and his diminished capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. We think that Goode's trial counsel properly perceived as relatively insignificant the fact of Goode's cooperation.

We thus conclude that Goode has failed to satisfy the prejudice prong of *Sykes.* Accordingly, his procedural default at trial, by failing to object to the jury instruction now challenged, bars federal habeas review of this issue.

## VI. FAILURE TO RECITE STATUTORY AND NONSTATUTORY MITIGATING CIRCUMSTANCES

■ Goode contends that the trial court improperly failed to recite certain statutory

---

**10.** Counsel for Goode also points to Goode's history of mental illness since childhood and the history of his psychiatric and psychological treatment over the years. We are satisfied both from the jury instructions and the conduct of the trial that this jury felt no restraint in giving full consideration to all the evidence relating to Goode's mental condition, past and current. For example, during the sentencing phase, the trial judge charged the jury: "If one or more aggravating circumstances are established, you should consider all the evidence tending to establish one or more mitigating circumstances and give that evidence such weight as you feel it should receive in reaching your conclusion as to the sentence which should be imposed." Trial Transcript, at 1255. We thus conclude that the evidence relating to Goode's mental and emotional problems is encompassed within the statutory mitigating circumstances relating to "mental or emotional disturbance" and to diminished "capacity ... to appreciate the criminality of his conduct or to conform his conduct to the requirements of law," both of which were charged to this jury. Moreover, the *Ford* case involved similar evidence, 696 F.2d at 860–61 (Kravitch, J., concurring in part and dissenting in part), which the en banc court must also have deemed to be encompassed within the statutory mitigating circumstances.

and nonstatutory mitigating circumstances. Specifically, he argues that the trial court should have found that Goode's "capacity ... to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired" by his mental condition, a statutory mitigating circumstance under Fla.Stat. Ann. § 921.141(6)(f) (West Supp.1982).[11] In a recent en banc case, this court characterized this same argument, made with reference to the Florida Supreme Court, as "simply 'quarreling'" with the state courts. *Ford v. Strickland,* 696 F.2d 804, 819 (11th Cir.1983) (Roney, J.). On the substantive issue of weighing of aggravating and mitigating circumstances, our review is limited to whether the Florida courts "have acted through a properly drawn statute with appropriate standards to guide discretion ...." *Id.* As in the *Ford* case, the Florida courts have so acted here. The Florida Supreme Court reviewed Goode's case with care and concern, refusing to depart from the normal review procedure, even though (1) Goode admitted his guilt, (2) Goode expressed a desire to be executed, and (3) Goode asked the Florida Supreme Court to dismiss his appeal. *Goode v. State,* 365 So.2d at 384. As in *Ford,* the Florida Supreme Court "reviewed the circumstances of [the] case consistently with its principles governing the aggravating and mitigating circumstances at issue ...." *Ford v. Strickland,* 696 F.2d at 819. In discussing those circumstances, in noting the trial judge's and jury's consideration of Goode's mental condition at the time of the offense, and in comparing Goode's case with at least one other death penalty case for consisten-cy, the Florida Supreme Court properly discharged its function. 365 So.2d at 384. Accordingly, we hold that Goode's claim with respect to the trial court's failure to recite statutory and nonstatutory mitigating circumstances is without merit.

## VII. CONSIDERATION OF EXTRA–RECORD MATERIALS

Goode contends that the Florida Supreme Court improperly received and considered extra-record materials in deciding Goode's direct appeal. The Florida Supreme Court rejected Goode's arguments in *Brown v. Wainwright,* 392 So.2d 1327 (Fla.), *cert. denied,* 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981). A recent en banc decision by this court has also rejected the same arguments. *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983). *Ford* is controlling, and accordingly we find no merit in this issue.

## VIII. NONSTATUTORY AGGRAVATING FACTOR

Goode contends that in sentencing him to death, the trial court improperly relied on a nonstatutory aggravating factor. Goode argues that reliance on such a factor violates the state law limiting consideration to statutory aggravating circumstances,[12] and also violates the Eighth and Fourteenth Amendments by introducing the extraneous, thus arbitrary, aggravating factor into the decision-making process.

Specifically, Goode argues that the trial judge relied upon his belief that society could no longer rehabilitate Goode and that

---

11. Although Goode's challenge is unclear, possibly it might be interpreted as going to the sentencing judge's findings of fact with respect to the mitigating circumstances relating to Goode's mental deficiencies. We reject any such challenge. The evidence from the four psychiatrists was in conflict, and we cannot say that the judge's findings are not fairly supported by the record. 28 U.S.C.A. § 2254(d)(8); *Sumner v. Matta,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Ford v. Strickland,* 696 F.2d 804, 819 (11th Cir.1983) (en banc) (Roney, J.).

12. The Florida death penalty provision expressly provides that the aggravating circumstances which may be considered in determining the appropriate sentence "shall be limited" to those enumerated in the statute. Fla.Stat.Ann. § 921.141(5) (West 1982); *see Proffitt v. Florida,* 428 U.S. 242, 250 n. 8, 96 S.Ct. 2960, 2965 n. 8, 49 L.Ed.2d 913 (1976); *Miller v. State,* 373 So.2d 882, 885 (Fla.1979) (reliance on nonstatutory aggravating circumstance by sentencing judge reversible error); *Elledge v. State,* 346 So.2d 998, 1003 (Fla.1977) (same); *Purdy v. State,* 343 So.2d 4, 6 (Fla.1977) (same).

only the death penalty would "once and for all guarantee society ... that [Goode] will never again kill, maim, torture, or harm another human being ...." For convenience, we refer hereafter to the alleged nonstatutory aggravating circumstance as the "recurrence factor."

Goode's argument is based upon the record of the sentencing proceedings. After the jury had recommended death, and before the trial court issued its judgment, Goode's previous attorney, Smith, made a statement in Goode's behalf, arguing that society had more to gain from a life sentence rather than a death penalty, *i.e.,* a life sentence would permit studies of Goode to advance scientific understanding of the subject of sexual abuse of children. Smith argued that the extensive psychiatric history of Goode, beginning when Goode was very young, presented a unique opportunity for such study, with potentially valuable benefits to society.

After Smith's statement, the trial judge issued his detailed findings in the sentencing phase. The trial judge made careful findings with respect to the aggravating circumstances, finding that only three aggravating circumstances existed. He then listed the two mitigating circumstances which he found to exist and the facts supporting them, stated that no other mitigating circumstances existed, detailed the facts that supported the finding of the three aggravating circumstances, stated that the mitigating circumstances did not outweigh the aggravating circumstances, and concluded that Goode should be sentenced to death. Following the foregoing careful and proper findings with respect to aggravating and mitigating circumstances, however, the trial judge made the following statements which form the basis of Goode's challenge:

> In closing I want to address myself to Counsel Smith's remarks for just a moment. The question of why should this man be executed for what he has done is a question that the Court has wrestled with for several days and has carefully considered the circumstances, but I have to be able to answer to myself why should I invoke the awesome punishment of death. Could not something be learned from Arthur? Am I not doing as I have seen and heard many do and merely so outraged by the activities that he has done that possibly my reason and judgment are blurred? I believe not.
>
> If organized society is to exist with the compassion and love that we all espouse, there comes a point when we must terminate that, and there are certain cases and certain times when we can no longer help, we can no longer rehabilitate and there are certain people, and Arthur Goode is one of them, that's actions demand that society respond and all we can do is exterminate.
>
> Philosophically I believe that in certain limited instances we should do that. In this particular case that is my opinion, and that is my order, and the only answer I know that will once and for all guarantee society, at least as far as it relates to this man, is that he will never again kill, maim, torture or harm another human being, and as you said in trial, Arthur, maybe I don't know who we blame. God forgive you of those desires or something in your environment that has made you have them, and whoever is to blame is beyond the power of this Court.
>
> You have violated the laws, you have had your trial and I am convinced that the punishment is just and proper, and truthfully, may God have mercy on your soul.

Trial Transcript, at 1280–81.

It is readily apparent from the foregoing quotation that the trial judge asked himself the "question of why should this man be executed for what he has done," indicating that this was a question that the judge had "wrestled with for several days and ... carefully considered the circumstances." Then in answer to his own question, the trial judge stated that "there are certain cases and certain times when we can no longer help, we can no longer rehabilitate, and there are certain people, and Arthur Goode is one of them, that's actions demand that society respond and all we can do is

exterminate." Thus the trial judge concluded: "In this particular case that is my opinion, and that is my order, and the only answer I know that will once and for all guarantee society, at least as far as it relates to this man, is that he will never again kill, maim, torture, or harm another human being." In sum, the trial judge asked himself why this man should be executed, and answered that Goode could no longer be rehabilitated and that imposing the death penalty was the only way to guarantee society that Goode would never kill again. It is readily apparent that the trial judge expressly cited the lack of rehabilitation and the possibility of future killing as a reason for imposing the death sentence.

However, when Goode presented this claim in a state habeas corpus petition, the Supreme Court of Florida rejected it, implicitly acknowledging that the foregoing would be an improper nonstatutory aggravating circumstance, but finding that the trial judge did not consider same. The Florida court found that the statements by the trial judge merely "explained why the result of his weighing process was proper." *Goode v. Wainwright,* 410 So.2d at 509.

■ We assume *arguendo,*[13] but expressly do not decide, that the foregoing finding of the Florida Supreme Court is entitled to the presumption of correctness afforded by 28 U.S.C.A. § 2254(d), unless the federal court on consideration of the record as a whole concludes that such factual determination is not fairly supported by the record. 28 U.S.C.A. § 2254(d)(8).[14] *Sumner v. Matta,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Sumner v. Matta,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (subsequent opinion after remand).

■ Evaluating the state court finding pursuant to the foregoing standard, and notwithstanding the deference we accord that finding, we are compelled to conclude that the state court finding is not fairly supported by the record as a whole. In finding that the sentencing judge did not consider the recurrence factor, the only elaboration given by the state court is that the trial judge was merely explaining why the result of his weighing process was proper. The Florida court's reason reveals the fallacy of its conclusion. When the sentencing judge explained that the "result of his weighing process was proper" because of the recurrence factor, it is apparent that the recurrence factor had in fact been considered. It is logically impossible to say that the death penalty is proper because of the recurrence factor and to simultaneously say that the factor was not considered.

Apparently sensing the inconsistency in the state court finding, the State offers several post hoc rationalizations. First, the State suggests that the sentencing judge's remarks were merely philosophical, *i.e.,* relating to capital punishment in the abstract as opposed to having any relationship to the instant case. It is true that the judge talked in abstract terms in two instances, but each time the judge immediately proceeded to apply the abstract thought directly to Goode. In one instance the judge stated:

If organized society is to exist with the compassion and love that we all espouse, there comes a point when we must terminate that, and there are certain cases and certain times when we can no longer help, we can no longer rehabilitate and there are certain people, *and Arthur Goode is one of them,* that's [whose] actions demand that society respond and all we can do is exterminate.

---

**13.** *Cf. Ford v. Strickland,* 696 F.2d at 811.

**14.** Goode has also offered to show by convincing evidence that the factual determination by the Florida court was erroneous. 28 U.S.C.A. § 2254(d). Goode represents to us that the trial judge is prepared to testify that he in fact did rely upon the nonstatutory aggravating factor. However, in *Washington v. Strickland,* 693 F.2d 1243 (5th Cir.1982) (en banc) (Unit B), we held that a trial judge may not testify about his "mental processes in reaching a judicial decision." Accordingly, Goode's challenge must be evaluated solely on the basis of the record of the sentencing proceedings, without the testimony of the trial judge.

Trial Transcript, at 1280–81 (emphasis added). It is apparent that the judge was speaking abstractly in referring, for example, to certain cases and certain times and certain people, but it is also apparent from the emphasized phrase that the judge applied the abstract thought to Goode.

Later the judge stated:

Philosophically I believe that in certain limited instances we should do that. *In this particular case* that is my opinion, and *that is my order,* and the only answer I know that will once and for all guarantee society, *at least as far as it relates to this man,* is that *he will never again kill,* maim, torture or harm another human being.

*Id.* at 1281 (emphasis added). Again while the judge stated that he was speaking "philosophically," the emphasized phrases demonstrate clearly that the abstract thoughts were applied in "this particular case" and "as it relates to this man."

Finally, the remarks at issue were introduced by the judge's question to himself as to "why should *this man* be executed for what he has done," *id.* at 1280 (emphasis added), and by the judge's acknowledgement that this is a "question that the Court has wrestled with for several days and has carefully considered the circumstances," *id.,*

both of which reinforce the obvious fact that the justification offered by the judge in answer to his own question was being applied to this case and this man.[15]

Thus we conclude that the State's suggestion—*i.e.,* that the sentencing judge's remarks were merely abstract and did not refer to any justification of this particular death sentence—simply cannot withstand a reading of the transcript.[16]

The second post hoc rationalization offered by the State to support the Florida Supreme Court determination is the chronology of the sentencing judge's written findings. The State argues that the judge made careful findings of three statutory aggravating circumstances, then found two mitigating circumstances, then found that the aggravating circumstances outweighed the mitigating, then stated the judgment of the court that Goode be sentenced to death, then ordered Goode's counsel to prepare appropriate documents to initiate the appellate proceedings, and only after all this made the remarks at issue. The State's argument is that this chronology suggests that the remarks at issue were not part of the weighing process. The argument is not persuasive, however, because the remarks at issue unequivocally reveal that the non-

15. In rejecting the State's abstraction argument, we are not at odds with the Florida Supreme Court. Nowhere did it mention or rely upon the alleged abstract nature of the judge's remarks. 410 So.2d at 509. In the court below, the district judge did mention that the sentencing judge's remarks were in philosophical justification of capital punishment generally. However, the district judge acknowledged the obvious fact that the judge's remarks were also in philosophical justification of the capital punishment "as applied in Petitioner's case." *Goode v. Wainwright,* No. 82–23 (M.D.Fla. Feb. 12, 1982). The district court's error was its failure to realize that a factor which is expressly stated as justification for imposing a particular death penalty was necessarily *considered* as a factor in the sentencing process.

16. A related argument relies upon the judge's remark that he has to be able to answer to himself. The argument is that the remarks at issue are his *personal* reasons. However, a factor is nonetheless nonstatutory and improper whether it be labeled a personal reason or a

philosophical reason or an abstract reason. The crucial question is not the label but whether the factor is *relied upon* by the sentencing judge in his decision-making process. The words used by the judge here compel the conclusion that he did in fact rely upon the recurrence factor in making his decision. Although the judge said he has to answer to himself, the clear import of his remarks is that he has to answer to himself in making his decision *in this case.* "The question of why should this man be executed for what he has done is a question that the court has wrestled with for several days and has carefully considered the circumstances, but I have to be able to answer to myself why should I invoke the awesome punishment of death." Trial Transcript at 1280. This reference is not to an unrelated, detached or separate personal reason; rather, the reference is to "why should this man be executed" and "why should I invoke the awesome punishment of death." There is absolutely no indication that the judge is talking about personal views upon which he *places no reliance.*

statutory recurrence factor was in fact considered by the judge in his weighing process and was in fact one of the judge's reasons for imposing the death sentence. Although the judge's remarks were made chronologically after he had announced the death sentence, the words used by the judge indicate clearly that the judge was reflecting on his decision-making process of the last few days:

> The question of why should this man be executed for what he has done is a question that the court has wrestled with for several days and has carefully considered the circumstances, but I have to be able to answer to myself why should I invoke the awesome punishment of death.

Trial Transcript, at 1280. The balance of his remarks were in the nature of an answer to the question he asked himself. The question he asked himself—"why should I invoke the awesome punishment of death" —was of course the decision itself, which was obviously what the trial judge had been wrestling with for several days. We conclude that the chronology cannot obfuscate the sentencing judge's express statements that related his remarks to the crucial decision itself.

Our conviction that the sentencing judge did in fact consider the nonstatutory aggravating factor is reinforced by the fact that the same judge considered the same nonstatutory recurrence factor in imposing an earlier death sentence. In *Miller v. State,* 373 So.2d 882 (Fla.1979), the same judge faced a situation very much like this case. In *Miller,* the accused committed a heinous murder while suffering from a mental illness from which he was not likely to recover. The judge relied upon the nonstatutory recurrence factor, using language reminiscent of that used here:

> [T]he only certain punishment and the only assurance society can receive that

this man never again commits to another human being what he did to that lady, is that the ultimate sentence of death be imposed.

*Id.* at 885. The Florida Supreme Court set aside the sentence in *Miller,* stating that "it was reversible error for the trial court to consider as an additional aggravating circumstance, not enumerated by the statute, the possibility that Miller might commit similar acts of violence if he were to ever be released on parole." *Id.* at 886. The Florida Supreme Court did not decide *Miller* until two years after Goode was sentenced. Thus, it is likely that the trial judge did not yet realize that consideration of the recurrence factor was improper. Indeed, during Goode's sentencing proceeding the judge expressly articulated his belief that he could consider nonstatutory factors:

> It is not this Court's opinion that because those [the statutory aggravating circumstances] have been set forth in the statute that they are the only matters the Court can look at in sentencing. However, they are the primary guidelines the Court must use in reaching a decision as to whether to impose the sentence of death or life imprisonment.

Trial Transcript, at 1274.[17]

Also supporting our conclusion are the unusual facts of this case. In the sentencing phase Goode himself testified, in awful specificity, of his willingness to kill again:

> The next statement I have here to prove my guilt, is if Judge Shearer [the trial judge] would authorize this next statement, which I know he won't—I know you won't authorize it—but if the judge would authorize me to murder a little boy . . . [Goode's testimony is interrupted by an objection which is overruled, and then Goode continues] As I was starting to say . . . I am ready right now, I am ready right now to murder another little boy. I

---

17. In both *Miller* and the instant case, the judge listed the several statutory aggravating circumstances which he found to exist and then expressly stated, using virtually identical language in each case, that he found no other aggravating circumstances. 373 So.2d at 883; Trial Transcript at 1275. In *Miller* the Supreme

Court of Florida apparently interpreted the trial judge to be saying at this point that he found no other *statutory* aggravating factors. Such an interpretation is even clearer in the instant case because the trial judge expressly stated on the record his understanding that he could consider nonstatutory aggravating circumstances.

am strictly a dangerous, cold-blooded murderer.

Trial Transcript at 1198–99. Thus, the trial judge was presented with stark evidence that Goode would in fact kill again. It would have taken considerable self-discipline to ignore such forceful testimony. Obviously trial judges and other judges can and routinely do ignore and decline to rely upon improper factors. However, a fair reading of the instant record compels the conclusion that the recurrence factor in this case was not ignored, but rather was relied upon as crucial evidence.

The transcript of the sentencing proceedings in this case yields only one possible reading, i.e., that the sentencing judge did rely upon the nonstatutory aggravating circumstance as one reason for imposing the death penalty on Goode. Accordingly, we conclude that the contrary finding of the Florida Supreme Court is not fairly supported by the record.[18]

Having determined that the state trial judge did consider the nonstatutory rehabilitation factor, we next address Goode's contention that the Eighth and Fourteenth Amendments have been violated because reliance on the extraneous factor introduced an arbitrary element into the sentencing decision in contravention of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its progeny.

We know from *Miller v. State,* 373 So.2d 882 (Fla.1979), that potential defendants in Florida cannot be sentenced to death in reliance upon the fact or probability that they cannot be rehabilitated and therefore probably would repeat such acts of violence.

In *Miller,* the same trial judge who sentenced Goode relied upon the same recurrence factor. Concluding that the factor was a nonstatutory aggravating circumstance and that the sentencing judge's reliance upon it was improper, the Florida Supreme Court ordered that Miller be resentenced.

As demonstrated by the above discussion, Goode's death sentence was imposed in reliance upon the recurrence factor. If we should permit Goode's death sentence to stand, Goode's execution would represent a unique, freakish instance. Goode would have been executed in reliance upon the recurrence factor, when all others in Florida have not been, and, pursuant to the law established in *Miller,* cannot be in the future. A central thrust of recent Supreme Court cases is that capital-sentencing procedures must avoid the imposition of the death penalty in an arbitrary and capricious manner. Since the landmark case of *Furman v. Georgia, supra,* the Supreme Court has insisted that the death penalty be imposed only pursuant to statutory schemes that are carefully designed to reduce the possibility of discriminatory and arbitrary sentencing. The focus has been on providing the decision-maker with relevant and accurate information, so that discretion is channeled by those clear and objective standards that the state deems relevant. *See Gregg v. Georgia,* 428 U.S. 153, 188–95, 96 S.Ct. 2909, 2932–35, 49 L.Ed.2d 859 (1976) (Stewart, J., joined by Powell & Stevens, JJ.); *id.* at 220–23, 96 S.Ct. at 2947–48 (White, J., joined by Burger, C.J. & Rehnquist, J.); *Proffitt v. Florida,* 428 U.S. 242,

---

**18.** We acknowledge considerable discomfort at the prospect of setting aside a sentence because the state trial judge considered the factor at issue here. The recurrence factor—e.g., whether a defendant is likely to kill again—is so highly relevant to the purposes underlying capital sentencing that it certainly would be an appropriate aggravating circumstance, had the Florida lawmakers designated it as such. However, it is not for us to establish the substantive sentencing policy for the State of Florida, and the Florida law is clear that the recurrence factor is *not* a statutory aggravating factor. *Miller v. State,* 373 So.2d 882, 886 (Fla. 1979) ("The legislature has not authorized consideration of the probability of recurring violent acts by the defendant."). The fact that the trial judge in the instant case relied upon this nonstatutory aggravating circumstance raises constitutional problems relating to whether the sentence has been imposed in an arbitrary manner, as discussed below, wholly aside from whether or not the recurrence factor is one which could have properly been a part of the statutory scheme had the State so provided. *Henry v. Wainwright,* 661 F.2d 56, 60 n. 9 (5th Cir.1981) (Unit B), *vacated and remanded on other grounds,* 457 U.S. 1114, 102 S.Ct. 2922, 73 L.Ed.2d 1326, *judgment reinstated,* 686 F.2d 311 (5th Cir.1982).

251–54, 96 S.Ct. 2960, 2966–67, 49 L.Ed.2d 913 (1976) (Powell, J., joined by Stewart & Stevens, JJ.); *Godfrey v. Georgia,* 446 U.S. 420, 427–29, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980) (Stewart, J., joined by Blackmun, Powell, & Stevens, JJ.); *cf. Gardner v. Florida,* 430 U.S. 349, 357–61, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977) (Stevens, J., joined by Stewart & Powell, JJ.). Thus viewed, the cases are concerned primarily with the Eighth Amendment as a device for guarding against arbitrary, capricious, or "freakish" sentencing:

> A capital sentencing scheme must, in short, provide a meaningful basis for distinguishing the few cases in which [the death penalty] . . . is imposed from the many cases in which it is not.

*Godfrey v. Georgia,* 446 U.S. at 427, 100 S.Ct. at 1764.

■ In determining whether the trial court's reliance on a nonstatutory aggravating circumstance, a violation of Florida's own sentencing statute, contravenes the Eighth and Fourteenth Amendments, we therefore look to the same concerns for consistency and channeled discretion which have informed the Supreme Court's decisions in *Furman, Proffitt,* and *Gregg.* These concerns are even more acute here. In *Proffitt* and *Gregg,* the Court addressed only facial challenges to untested capital punishment statutes. Thus, the Court's decisions centered around the likelihood that a particular scheme, when actually used, would result in "wholly arbitrary and capricious action." *Gregg v. Georgia,* 428 U.S. at 189, 96 S.Ct. at 2932 (Stewart, J., joined by Powell & Stevens, JJ.). Of central importance to the Court was the probability that similarly situated defendants, in terms of personal history and characteristics, as well as the nature of their crimes, would suffer the same punishment. *See id.* at 198, 96 S.Ct. at 2936 (discussing review by Georgia Supreme Court to compare each death sentence with sentences received by similarly situated defendants); *id.* at 224, 96 S.Ct. at 2948 (White, J., with Burger, C.J. & Rehnquist, J., concurring in judgment) (suggesting that failure by state supreme court to perform disproportionality review

would impair constitutionality of statutory scheme); *Proffitt v. Florida,* 428 U.S. at 253, 96 S.Ct. at 2967 (Powell, J., with Stewart & Stevens, JJ.) (citing review by Florida Supreme Court to ensure that sentence is consistent with other sentences imposed in similar circumstances). In other words, the Eighth Amendment analysis set out in *Furman* and its progeny logically applies at two separate stages: first, when the statutory terms on their face will not suffice to prevent arbitrary sentencing; and second, when the statutory scheme, regardless of its facial validity, is applied in an arbitrary manner. *See Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (Stewart, J., joined by Blackmun, Powell & Stevens, JJ.) (state has responsibility to tailor *and apply* its law in manner that avoids arbitrary and capricious sentencing); *Gregg v. Georgia,* 428 U.S. at 224, 96 S.Ct. at 2948 (White, J., joined by Burger, C.J. & Rehnquist, J., concurring in judgment) (suggesting that failure by state supreme court properly to perform disproportionality review mandated by statute would require setting aside of death sentence); *Spinkellink v. Wainwright,* 578 F.2d 582, 604–05 (5th Cir.1978) (if state has properly drawn statute, which it follows, then arbitrariness and capriciousness condemned in *Furman* are conclusively removed), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). Thus, a particular scheme may inherently result in arbitrary sentencing, or it may be applied in such a manner as to single out for different treatment one particular defendant—as, for example, when the sentencing court chooses to ignore altogether the statutory requirements. Either way, the result is an arbitrary or capricious application of the death penalty.

Stated in another way, the Eighth Amendment requirements of consistency and nonarbitrariness are the predicate and *raison d'etre* of the Florida rule that nonstatutory aggravating circumstances cannot be considered. When that rule is ignored and nonstatutory circumstances are considered, Eighth Amendment concerns are implicated. We so held in *Henry v. Wain-*

*wright,* 661 F.2d 56 (5th Cir., 1981) (Unit B), *vacated and remanded on other grounds,* 457 U.S. 1114, 102 S.Ct. 2922, 73 L.Ed.2d 1326, *judgment reinstated,* 686 F.2d 311 (5th Cir.1982). In *Henry,* we said:

> Here, however, the limitations of the statute make the death penalty constitutional. Ignoring those limitations thus implicates the Constitution.

661 F.2d at 60.

When understood in terms of the Supreme Court's concern for rational consistency in sentencing, the issue before this court is a relatively simple one. Goode's death sentence was imposed in reliance on a factor which the Florida courts themselves have ruled improper. If we should permit Goode's sentence to stand, Goode's execution would represent a unique, freakish case. No other defendant in the State of Florida could be so executed, pursuant to the law established by the Supreme Court of Florida in *Miller v. State, supra.* Thus, whatever might be the outer bounds of the "arbitrary or capricious" concept developed in *Furman* and its progeny, the instant case surely lies at its core. A departure without reason from the express terms of the sentencing statute, with the result that this defendant would be executed when all others in the same circumstances would not be, is the very benchmark of arbitrary and capricious decision-making. As such, it constitutes more than a mere violation of Florida's own sentencing procedures; it also implicates those concerns which are fundamental to the Supreme Court's interpretation of the Eighth Amendment.[19] We conclude therefore that Goode's sentence was imposed in an arbitrary manner and that his execution would be a freakish instance, in violation of the Eighth and Fourteenth Amendments.[20]

19. That it is the violation of Florida's own sentencing rule which triggers the Eighth Amendment violation requires some comment. We recognize that the violation by a state of its own criminal procedure rule generally is not cognizable on federal habeas. *See e.g., Van Poyck v. Wainwright,* 595 F.2d 1083 (5th Cir. 1979); *Blankenship v. Estelle,* 545 F.2d 510 (5th Cir.1977), *cert. denied,* 444 U.S. 856, 100 S.Ct. 115, 62 L.Ed.2d 75 (1979); *Bell v. Estelle,* 525 F.2d 656 (5th Cir.1975); *Pringle v. Beto,* 424 F.2d 515 (5th Cir.1970). Occasionally, however, such a violation will implicate constitutional concerns—most often the concept of "fundamental fairness" which resides in the Fourteenth Amendment. *See e.g., Bryson v. Alabama,* 634 F.2d 862 (5th Cir.1981); *Hicks v. Wainwright,* 633 F.2d 1146 (5th Cir.1981); *Maggard v. Florida Parole Commission,* 616 F.2d 890 (5th Cir.), *cert. denied,* 449 U.S. 960, 101 S.Ct. 372, 66 L.Ed.2d 227 (1980); *Atkins v. Michigan,* 644 F.2d 543 (6th Cir.), *cert. denied,* 452 U.S. 964, 101 S.Ct. 3115, 69 L.Ed.2d 975 (1981); *Brewer v. Overberg,* 624 F.2d 51 (6th Cir.1980), *cert. denied,* 449 U.S. 1085, 101 S.Ct. 873, 66 L.Ed.2d 810 (1981). The constitutional significance of a state procedural violation is not necessarily limited to Fourteenth Amendment interests. As *Furman* and its progeny demonstrate, the substantive content of the Eighth Amendment is uniquely concerned with procedural regularity. *See Lockett v. Ohio,* 438 U.S. 586, 632, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (Rehnquist, J., dissenting) (criticizing use of Eighth Amendment as device "for importing into the trial of capital cases extremely stringent procedural restraints"). Thus, in death penalty cases the constitutional dimen-

sions of the Eighth Amendment's proscription of cruel and unusual punishment have significant procedural imperatives. This requires that we take as our starting point those procedures which the state has implemented to prevent the arbitrary imposition of the death penalty. *See Godfrey v. Georgia,* 446 U.S. at 427–33, 100 S.Ct. at 1764–67 (Stewart, J., joined by Blackmun, Powell & Stevens, JJ.). Implicit in a decision that a particular scheme will likely result in rational and consistent sentencing is the critical assumption that the state will *follow* that scheme. Thus, the failure to abide by that scheme can result in the arbitrary imposition of the death penalty in violation of the Eighth Amendment. *Accord Henry v. Wainwright, supra.*

20. We do not read *Spinkellink v. Wainwright, supra,* as prohibiting our inquiry as to whether Goode's execution would be an arbitrary departure from Florida's capital-sentencing procedures. In *Spinkellink,* the Former Fifth Circuit wisely declined to duplicate the proportionality review of other cases conducted by the Florida Supreme Court to ensure that Spinkellink was equally or more deserving of the death sentence. *See also Ford v. Strickland,* 696 F.2d 804, 818–19 (11th Cir.1983) (Roney, J.). That, however, is vastly different from our inquiry in the instant case into the discrete matter of whether the trial judge in fact relied upon the nonstatutory recurrence factor and thus departed from the statutory procedures. Our inquiry is much like that undertaken by the en banc court in *Ford v. Strickland,* when it addressed whether or not the Florida Supreme

In our recent en banc decision, *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983), we concluded that, under some circumstances, consideration of a nonstatutory aggravating factor would not impermissibly taint the process. It is appropriate, therefore, to indicate why the issue before us is different from the issue addressed in *Ford.* There, we addressed the constitutional implications of a rule (referred to hereafter as the "Florida rule") which has evolved in several Florida Supreme Court cases. Pursuant to the Florida rule, the Florida Supreme Court has sustained death sentences in the following situation: where the sentencing judge has found several statutory aggravating circumstances, but no mitigating circumstances; and where the Florida Supreme Court has found on direct appeal a deficiency in some but not all of the aggravating factors, and can "presume" that the weighing process would have reached the same outcome. Thus, the Florida Supreme Court has sustained the death penalty, notwithstanding the fact that the sentencing judge erroneously found one or more aggravating circumstances, where there are other valid statutory aggravating circumstances and where there are *no* mitigating circumstances and where the Florida Supreme Court can conclude that the outcome of the weighing process would not have been changed.

A majority [21] of the en banc court in *Ford* interpreted the Florida rule as "a harmless error rule to correct mere errors of state law," *Ford v. Strickland,* 696 F.2d 804, 820 (Godbold, C.J., dissenting in part and specially concurring in part), or as "an evaluation . . . very like the application of a harmless error rule." *Id.* at 815 (Roney, J.). The majority held that such a state law harmless error rule,[22] which presumably will be applied "with an eye towards consistency," *id.* at 823, does not violate the Eighth Amendment requirements of consistency and reliability.

Court had relied upon extra-record materials. Indeed the *Spinkellink* panel itself implicitly recognized the problems inherent in the failure to follow the statutory procedures:

> [O]ur concern here in this attack on Section 921.141 as applied would be whether the Florida courts have *followed* the statute in imposing Spinkellink's death sentence, and a comparison of Spinkellink's case with other Florida death penalty cases would be unnecessary.

578 F.2d at 604 (emphasis added). Thus the broad language of *Spinkellink* disparaging an "as applied" challenge must be read in the context of the facts of that case, and not as a per se ban on any "as applied" attack on a capital-sentencing statute. The "as applied" challenge in the instant case is very similar to that entertained and sustained by the Supreme Court in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). There the Court examined Godfrey's claim that the state court had rendered an arbitrary construction of one of the aggravating circumstances. The Court framed the issue as "whether, in light of the facts and circumstances of the murders that Godfrey was convicted of committing, the Georgia Supreme Court can be said to have applied a constitutional construction of the [aggravating circumstance]." *Id.* at 432, 100 S.Ct. at 1766. (Stewart, J., joined by Blackmun, Powell & Stevens, JJ.) The Court examined the facts of the particular murders, determined that those facts did not include torture or other criteria that the Georgia Supreme Court had defined as limiting characteristics of the statutory factor, and thus concluded that "[t]here is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Id.* at 433, 100 S.Ct. at 1767. Although Justice Stewart's plurality opinion was joined by only three other Justices, Justices Brennan and Marshall agreed with the plurality that the statute was unconstitutionally applied. *Id.* at 433, 434–36, 100 S.Ct. at 1767, 1767–68 (Marshall, J., joined by Brennan, J., concurring in the judgment).

Following *Godfrey* we are required to evaluate whether Goode's death sentence was imposed in an arbitrary manner.

**21.** Chief Judge Godbold's opinion was joined by Judge Clark. Judge Roney's opinion was joined by Judges Hill, Fay, Vance and Henderson. Together the two opinions commanded the support of seven judges, a majority of the court.

**22.** Chief Judge Godbold expressly treats the Florida rule as "a harmless error rule to correct mere errors of state law." *Id.* at 824. Judge Roney does not do so expressly, but he does so implicitly; he adopts Judge Godbold's opinion, and he does not mention *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which articulates the standard applicable to constitutional errors, *i.e.,* harmless error beyond a reasonable doubt. *Ford v. Strickland,* 696 F.2d at 813–15.

We conclude that *Ford* is not applicable to the instant case for two reasons. First, the sentencing judge here found two mitigating circumstances: the fact that there was no evidence of prior criminal activity, and the fact of Goode's youth, i.e., 22 years of age. In addition, the evidence from all four psychiatrists was undisputed that Goode suffered from a mental disorder, *Goode v. State,* 365 So.2d at 382, although two of the psychiatrists testified, and the sentencing judge found, that Goode was not under the influence of extreme mental or emotional disturbance at the time of the crime, and that Goode's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was not substantially impaired. Because there were substantial mitigating circumstances in this case, the Florida rule by its own terms is inapplicable. Thus, there was no state rule or procedure in this case to alleviate the trial judge's error in relying upon the improper recurrence factor. In *Ford* the consistent application of the Florida harmless error rule would tend to ensure that all others in Ford's circumstances would receive the same treatment. By contrast, Goode would be executed here, although all other defendants in the state would have been entitled to resentencing under the circumstances.

Second, the consideration of the nonstatutory aggravating circumstance in the instant case involves error of constitutional dimension, whereas in *Ford* Chief Judge Godbold[23] expressly limited his approval of the Florida rule to cases involving mere errors of state law, *id.* at 824, and expressly distinguished *Henry v. Wainwright, supra,* because it involved constitutional error.[24] To conclude that constitutional error is harmless, a reviewing court must apply the *federal* standard and conclude that the error is harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1976). In the instant case the State does not suggest that the sentencing judge's reliance on the recurrence factor is harmless. Moreover, it is not possible to read the sentencing transcript without concluding that the trial judge placed significant, and perhaps decisive, reliance upon the improper recurrence factor. Therefore, we must conclude that the error was not harmless beyond a reasonable doubt.

Concluding that Goode's death sentence was imposed in an arbitrary and freakish manner, we find[25] that the Eighth and Fourteenth Amendments have been violated.[26]

## IX. CONCLUSION

For the reasons set out in Part VIII, this case must be remanded to the district court

**23.** Judge Roney's *Ford* opinion approving the Florida rule is not expressly limited to state law errors, but such limitation may be implicit. See note 22, *supra.*

**24.** *Henry v. Wainwright, supra,* involved the same constitutional error which we now address, *i.e.,* consideration of a nonstatutory aggravating circumstance.

**25.** Since the State has not argued that *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), bars consideration of this issue, we do not consider the *Sykes* bar as a ground for denying appellant's claim. *Washington v. Watkins,* 655 F.2d 1346, 1368 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982).

**26.** It is true that the constitutionality of the Florida rule may be implicated in *Barclay v. Florida,* 411 So.2d 1310 (Fla.1982), in which the Supreme Court has recently granted certiorari.

—— U.S. ——, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982). Also pending in the Supreme Court is *Zant v. Stephens,* 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982), which involves an analogous Georgia rule. Thus, it is true that there is a possibility of a Supreme Court ruling that a state may constitutionally permit the consideration of a nonstatutory aggravating factor under some circumstances. However, neither case challenges a death sentence which was imposed in reliance upon an aggravating factor which the state procedures themselves forbid; and neither case involves the proposed execution of a defendant notwithstanding that all others in the state would have been entitled to resentencing under the circumstances. For these reasons, we do not anticipate that either case would affect our decision in the instant case and accordingly we decline to delay our decision pending disposition of *Barclay* and *Stephens.*

with instructions that the writ of habeas corpus issue conditioned upon the State's resentencing of Goode.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.