392 So.2d 1327 (1981)
Joseph Green BROWN et al., Petitioners,
v.
Louie L. WAINWRIGHT, Respondent.
No. 59732.
Supreme Court of Florida.
January 15, 1981.
*1328 Samuel S. Jacobson and Albert J. Datz of Datz, Jacobson & Lembcke, Jacksonville, Marvin E. Frankel, New York City, Richard L. Jorandby, Public Defender and Craig S. Barnard, Chief Asst. Public Defender, West Palm Beach, for petitioners.
Jim Smith, Atty. Gen., and George R. Georgieff, Carolyn M. Snurkowski and Raymond L. Marky, Asst. Attys. Gen., Tallahassee, for respondent.
PER CURIAM.
Joseph Green Brown petitions the Court for a writ of habeas corpus to obtain relief from an allegedly unconstitutional sentence of death. Brown was convicted of first-degree murder and sentenced to death, following which his conviction and sentence were affirmed by this Court. Brown v. State, 381 So.2d 690 (Fla. 1980). An application for certiorari is now pending in the United States Supreme Court. Brown v. Florida, No. 80-5708 (U.S. Nov. 17, 1980).
Alleging common issues of law and fact, Brown has joined with one hundred and twenty-two other persons who seek relief from allegedly unconstitutional sentences of death. The dominant theme in the multiple requests for relief is the alleged impropriety of this Court's having considered, in the course of reviewing sentences of death, documents which were not made available to the defendants' counsel. For most of the petitioners, the alleged impropriety was the Court's consideration of undisclosed documents not related to the proceedings in which their sentences were imposed or upheld, but seen in the course of reviewing *1329 death sentences approved or considered for other criminal defendants.
Before reaching the merits of the petitions, we first consider the procedural basis on which the Court has been asked to entertain habeas corpus petitions on a consolidated basis.

I
The writ of habeas corpus  the common law remedy used primarily to deliver from imprisonment those who are illegally confined[1]  has long been recognized as an essential vehicle by which fundamental individual liberties are shielded from illegal governmental action.[2] Traditionally, habeas corpus has been characterized by its utility in cutting through the "procedural morass" of institutional red tape so as to secure the release of persons unlawfully detained.[3] It has been recognized, however, that no prisoner has an interest in the illegal restraint of another, since a sentence of imprisonment operates on each individually.[4] A joinder of habeas corpus petitions, therefore, being unique, requires close scrutiny and a compelling justification.
The joinder of criminal defendants in trial proceedings is commonplace. The reasons which support joinder in those situations  considerations of judicial economy flowing from the presentation of common issues of law and fact, weighed against the potential prejudice to the defendants sought to be joined[5]  provide a useful perspective from which to examine the desirability of deciding jointly the claims presented here.
In multiple habeas corpus petitions, such as those before us, prejudice to the petitioners is obviously of no concern. For one thing, these proceedings do not involve adjudications of guilt, but only the legality of petitioners' confinement as related to this Court's sentence review.[6] For another, petitioners themselves, rather than the prosecuting authority, have sought consolidated consideration.
Considerations of judicial economy, then, are alone relevant here. As to these, economies become attenuated, and the potential benefits less attractive, as the disparity between legal and factual issues increases.[7] Multiple party joinder is a function of the facts and circumstances of each case, with the determination in each necessarily resting within the sound discretion of the court.[8] In the final analysis, a balancing test is employed to take into account the relative advantages and disadvantages attendant to joint consideration of the common and any noncommon claims presented.
Brown and the other petitioners in this proceeding  the one hundred and twenty-three inmates on "death row"  premise their joint filing for habeas corpus relief on alleged judicial economies which will flow from our considering in one proceeding allegedly common issues of law and fact. Those economies are not readily apparent in considering the several petitions, as the facts relevant to each vary significantly. Petitioners' appendices, and their request for a special master to develop facts further, bear this out. Petitioners' cases are even in different stages of the appellate *1330 process. Joined together are persons whose appeals from sentences of death are pending in this Court and persons whose sentences have already been affirmed by this Court  some more than once. The first category of petitioners have filed requests which are obviously premature.
The economies petitioners assert only become manifest if we rule precisely in the manner petitioners have urged  a presumptuous view of the merits of the cause. The fact of the matter is that to consider Brown's claim along with each of the others would plainly prove more unwieldly than economical.[9] Unlike In re Baker, 267 So.2d 331 (Fla. 1972),[10] this case does not involve the routine application of a previously adjudicated constitutional issue to numerous persons who are, in reality, similarly situated. The claims for relief in these petitions present for our analysis new and unresolved constitutional issues, some applicable to one group of petitioners and some applicable to others.[11]
The joinder here is manifestly designed, at best, to curtail all executions in Florida on legal grounds not yet adjudicated or, at least, to suspend the imposition of any lawful sentence until new legal issues are resolved. The latter objective, of course, has already been achieved. To allow a joinder under these circumstances in future cases would distort habeas corpus beyond recognition and create a pernicious precedent in capital cases. We decline to approve this precedent. There is no justification for joinder in situations such as this.
To avoid absurd technicalities, however, we decline to treat each petition as if it were separately filed and enter a separate order or opinion on each. Rather, our disposition of Brown's petition effectively disposes of all claims for relief of those petitioners who have joined with Brown. In the future, attempts to create a class action habeas corpus proceeding in situations such as this will be rejected summarily.

II
Turning to the legal issues presented, we perceive that petitioners' several constitutional claims all emanate from their assertion that we have "engaged in the continuing practice of requesting and receiving information concerning capital appellants which was not presented at trial and not a part of the trial record or record on appeal." This information allegedly includes pre-sentence investigations, psychiatric evaluations or contact notes made in the corrections system after conviction, and psychological screening reports made after conviction by corrections personnel.[12] The receipt of this information, petitioners assert generally, has led to a rash of constitutional violations ranging from a denial of due process in individual cases where information was received, on the one hand, to a pervasive violation of Gardner v. Florida, 430 U.S. 349, *1331 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), in all capital cases reviewed and affirmed by the Court, on the other hand. In short, petitioners contend that our alleged misconduct requires our invalidation of all death sentences imposed or approved in Florida, and by necessary implication, that we declare Florida's death penalty statute invalid and unconstitutional in its operation.
Despite strident characterizations of our receipt of these materials,[13] and notwithstanding the vigor and pith of the hypotheses on which petitioners depend, the doctrines of constitutional law here argued are singularly unpersuasive. Even if petitioners' most serious charges were accepted as true, as a matter of law our view of the non-record information petitioners have identified is totally irrelevant either to our appellate function in capital cases as it bears on the operation of the statute, or to the validity of any individual death sentence.
Florida's death penalty statute, section 921.141, Florida Statutes (1979), directs that a jury and judge, not this Court, must weigh the evidence of aggravating and mitigating circumstances delineated in the statute to determine whether death is an appropriate sentence. The jury performs that function only to recommend a sentence to the trial judge. It then becomes the responsibility of the trial judge to weigh evidence of aggravating and mitigating circumstances in order to arrive at a reasoned judgment as to the appropriate sentence to impose.[14]
This Court's role after a death sentence has been imposed is "review," a process qualitatively different from sentence "imposition." It consists of two discrete functions. First, we determine if the jury and judge acted with procedural rectitude in applying section 921.141 and our case law. This type of review is illustrated in Elledge v. State, 346 So.2d 998 (Fla. 1977), where we remanded for resentencing because the procedure was flawed  in that case a nonstatutory aggravating circumstance was considered. See also Brown v. State, 381 So.2d 690 (Fla. 1980); Kampff v. State, 371 So.2d 1007 (Fla. 1979).
The second aspect of our review process is to ensure relative proportionality among death sentences which have been approved statewide. After we have concluded that the judge and jury have acted with procedural regularity, we compare the case under review with all past capital cases to determine whether or not the punishment is too great. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). In those cases where we found death to be comparatively inappropriate, we have reduced the sentence to life imprisonment. See Malloy v. State, 382 So.2d 1190 (Fla. 1979); Burch v. State, 343 So.2d 831 (Fla. 1977); Jones v. State, 332 So.2d 615 (Fla. 1976).
Neither of our sentence review functions, it will be noted, involves weighing or reevaluating the evidence adduced to establish aggravating and mitigating circumstances. Our sole concern on evidentiary matters is to determine whether there was sufficient competent evidence in the record from which the judge and jury could properly find the presence of appropriate aggravating or mitigating circumstances. If the findings of aggravating and mitigating circumstances are so supported, if the jury's recommendation was not unreasonably rejected,[15] and if the death sentence is not disproportionate to others properly sustainable under the statute, the trial court's sentence must be sustained even though, had we been triers and weighers of fact, we might have reached a different result in an independent evaluation.
It is not the function of this court to cull through what has been listed as aggravating *1332 and mitigating circumstances in the trial court's order, determine which are proper for consideration and which are not, and then impose the proper sentence. In accordance with the statute, the culling process must be done by the trial court.
Mikenas v. State, 367 So.2d 606, 610 (Fla. 1978). Accord, Hargrave v. State, 366 So.2d 1 (Fla. 1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979).
The record of each proceeding, and precedent, necessarily frame our determinations in sentence review. Our opinions, of course, then expound our analysis. Factors or information outside the record play no part in our sentence review role. Indeed, our role is neither more nor less, but precisely the same as that employed by the United States Supreme Court in its review of capital punishment cases. Illustrative of the Court's exercise of the review function is Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).
Petitioners' contentions in this proceeding are essentially grounded on Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Gardner stands for the proposition that a sentence of death may not be imposed (note the word "imposed") to any extent on non-record, unchallengeable information. Id. at 362, 97 S.Ct. at 1206. Since we do not "impose" sentences in capital cases, Gardner presents no impediment to the advertent or inadvertent receipt of some non-record information. The Kentucky Supreme Court explained the distinction which has eluded petitioners in Ex Parte Farley, 570 S.W.2d 617 (Ky. 1978), responding to the very assertion that is made here concerning the review of "non-record" materials in capital cases:
Every opinion from a case book, every text or treatise, every law review article, every philosophical, historical or religious document a judge might see fit to read and consider, including the Holy Bible, is a tangible source of information from which he may pick and choose in arriving at a judgment.
* * * *
There are obviously differences between individualized information pertaining to the defendant personally, which is to be considered by a trial judge in fixing a sentence, and the impersonal data that may be used by an appellate court in determining whether the judgment of a trial court is or is not in line with what has been done in comparable cases.
* * * *
It seems to us that the difference is quite fundamental. If a judge or jury deciding one's fate is going to consider reports of what other people say about him, certainly he should be entitled to see them. "The risk that some of the information accepted in confidence may be erroneous, or may be misinterpreted, by the investigator or by the sentencing judge, is manifest." Gardner v. Florida, supra, at 430 U.S. 359, 97 S.Ct. 1205. But we are not the sentencing court. In any given case before us we intend to comply with the statutory request to include in our decision a reference to those similar cases that have been taken into consideration. Presumably, however, the petitioners want to know not only what will be taken into consideration, but what will not, and to know it in advance, so that they can urge upon us what to choose and what to avoid.
* * * *
We do not find it possible to believe that in Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Supreme Court of the United States meant to lay down a principle so pervasive as to require an appellate court to lay out for inspection by the appellant, even in a capital case, all of the information in its hands from which it may seek perspective and guidance in reviewing the propriety of his sentence. We therefore hold that Gardner does not apply.
Id. at 625-27 (footnote omitted).
It is evident, once our dual roles in the capital punishment scheme are fully appreciated, that non-record information we may have seen, even though never presented to *1333 or considered by the judge, the jury, or counsel, plays no role in capital sentence "review." That fact is obviously appreciated by the United States Supreme Court, for it very carefully differentiated the sentence "review" process of appellate courts from the sentence "imposition" function of trial judges in Proffitt and in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
A remaining question is whether the reading of non-record documents would so affect members of this Court that they could not properly perform their assigned appellate functions. Plainly, it would not. Just as trial judges are aware of matters they do not consider in sentencing, Alford v. State, 355 So.2d 108 (Fla.), cert. denied, 436 U.S. 935, 98 S.Ct. 2835, 56 L.Ed.2d 778 (1978), so appellate judges are cognizant of information that they disregard in the performance of their judicial tasks.[16]
The upshot of this is that petitioners' claims are untenable.

III
We cannot pass this opportunity to put this case in a more rational perspective than it has been accorded by counsel and the media. This case emerges from society's continuing wrangling over the moral and social justification for capital punishment. Regrettably, the thunderous emanations of this great debate, and the manner in which this joint petition was presented to the Court, have cast a pall on the integrity of the painful process by which this Court attempts to deal with the responsibility it has been assigned. It seems to us both unwarranted and unseemly to villify those who endeavor to follow the constitution; we are, after all, the messengers, and not the message.
Florida's death penalty statute has been held constitutional time and time again.[17] We are obliged to apply it so long as the citizens of this state deem it an appropriate punishment for select acts of criminality, and so long as the United States Supreme Court tolerates its use. Views on the subject can always be addressed to the Florida legislature or to the people of Florida, but attempts to pervert judicial processes, or to castigate the judiciary, benefit no one in the resolution of this societal debate.
The petitions of Brown and the others for writs of habeas corpus and for other extra-ordinary relief are denied. The motion for *1334 appointment of a special master and sundry other relief is denied. The stays of execution for Carl Ray Songer and Lenson Hargrave are dissolved.
No petitions for rehearing will be entertained.
SUNDBERG, C.J., and ADKINS, OVERTON, ENGLAND, ALDERMAN and McDONALD, JJ., concur.
BOYD, J., concurs in result with an opinion.
BOYD, Justice, concurs in result with an opinion.
I am convinced that no member of this court was influenced by any extraneous materials.
Although I don't agree with all the language in the majority opinion, I concur in the result.
NOTES
[1] Porter v. Porter, 60 Fla. 407, 53 So. 546 (1910).
[2] For a short overview of the history of the writ of habeas corpus, see State ex rel. Deeb v. Fabisinski, 111 Fla. 454, 152 So. 207 (1933).
[3] Price v. Johnston, 334 U.S. 266, 269, 68 S.Ct. 1049, 1052, 92 L.Ed. 1356 (1948).
[4] See State ex rel. Williams v. Purdy, 242 So.2d 498 (3d DCA), appeal dismissed, 248 So.2d 171 (Fla. 1971), citing In re Kosopud, 272 F. 330 (N.D. Ohio 1920) and Riley v. City and County of Denver, 137 Colo. 312, 324 P.2d 790 (1958).
[5] See Abbott v. State, 334 So.2d 642 (3d DCA 1976), cert. denied, 345 So.2d 420 (Fla. 1977), and cert. denied, 431 U.S. 968, 97 S.Ct. 2926, 53 L.Ed.2d 1064 (1977); Tifford v. State, 334 So.2d 91 (Fla.3d DCA 1976), cert. denied, 344 So.2d 327 (1977).
[6] See Note, Multiparty Federal Habeas Corpus, 81 Harv.L.Rev. 1482, 1483 (1968).
[7] See id. at 1488.
[8] See Menendez v. State, 368 So.2d 1278 (Fla. 1979); Stripling v. State, 349 So.2d 187 (Fla.3d DCA 1977), cert. denied, 359 So.2d 1220 (1978).
[9] State ex rel. Williams v. Purdy, 242 So.2d 498 (3d DCA), appeal dismissed, 248 So.2d 171 (Fla. 1971) (class action not an appropriate remedy in habeas corpus proceeding). We note that the applicability to habeas corpus of the rules concerning joinder and class actions has engendered much controversy in the federal courts. Harris v. Nelson, 394 U.S. 286, 294 n. 5, 89 S.Ct. 1082, 1088 n. 5, 22 L.Ed.2d 281 (1969); United States ex rel. Sero v. Preiser, 506 F.2d 1115 (2d Cir.1974), cert. denied, 421 U.S. 921, 95 S.Ct. 1587, 43 L.Ed.2d 789 (1975); Adderly v. Wainwright, 58 F.R.D. 389, 400 (M.D.Fla. 1972). See generally Note, Multiparty Federal Habeas Corpus, 81 Harv.L.Rev. 1482 (1968).
[10] In Baker, this Court, pursuant to the United States Supreme Court's mandate in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), imposed life sentences on the class of persons previously sentenced to death who had not been resentenced as of that date.
[11] The disparities are highlighted by the state's motion to dismiss those of the petitions which allege no direct "taint" in our review of prisoners' sentences.
[12] Petitioners also assert that we have seen and were prejudicially affected (1) by one reference in a letter to the Court that one convict refused to submit to a psychiatric report, (2) by the mention in letters to the Court that there exist probation and parole violation reports for two convicts, and (3) by the mention in another letter to the Court that there exists a prison classification and admission summary for one convict.
[13] At oral argument, counsel for petitioners charitably described our receipt of these materials as "an understandable effort to be fully informed."
[14] The relationship of the judge's responsibility to the jury's, about which much has been said in our opinions, is not germane here.
[15] Tedder v. State, 322 So.2d 908 (Fla. 1975).
[16] At oral argument on the joint petitions, counsel clarified petitioners' "proportionality taint" argument. He conceded that appellate judges receive and review all types of non-record information in the course of their duties, and that there is no impropriety in that occurring. He stated, moreover, that one constitutionally infirm decision by this Court would not itself skew the entire process by which we guarantee proportionality review in capital cases, so as to invalidate all other death sentences or the operation of the statute. He asserted, rather, that a systematic pattern of constitutionally defective review would be required for the relief requested, and he claimed to have found that pattern in the Court's having received in several cases, by request or otherwise, the "tainted" materials which were never displayed to counsel. As we view the case, of course, appellate review can never be compromised, in the constitutional sense required by Proffitt, by the receipt of any quantity of non-record information. Cf. Goodman v. Olsen, No. 45,356 (Fla. July 30, 1976), cert. denied, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977), where the United States Supreme Court denied review of an order of this Court which had rejected a request to invalidate a decision of this Court allegedly made on the basis of improper, non-record information.
[17] We cannot help but observe that the operation of capital punishment laws has been dependent upon a changing set of procedural principles, see Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), which have imposed shifting, supervisory standards on state high courts. The "tainted" information we are charged with reviewing was, as counsel concedes, in every instance obtained to deal with newly-articulated procedural standards. It would be ironic indeed if petitioners were successful in their assertion that our statute operates unconstitutionally because this Court has acted promptly from time to time to respond to new directives from the Supreme Court as to what procedures are required to make the statute operate in a constitutional manner.