Ball, Ball, Duke & Matthews, Samuel Kaufman, Montgomery, Ala., for Thompson.

ON PETITION FOR REHEARING

Before TJOFLAT, HILL and JOHNSON, Circuit Judges.

PER CURIAM:

Plaintiff-appellant United States of America petitions for a rehearing of the decision rendered on May 16, 1983, in *United States v. Devall*, 704 F.2d 1513 (11th Cir.1983). In that decision, we affirmed a decision of the district court which affirmed income deduction orders of the bankruptcy court requiring the Social Security Administration to send a portion of each Chapter 13 debtor's social security benefits directly to the Chapter 13 trustee. Appellant calls to our attention that on April 20, 1983, Congress enacted an amendment to the Social Security Act which addresses the subject of our decision. Social Security Amendments of 1983, Pub.L. No. 98–21, § 335, 97 Stat. 65 (1983). Appellant asks this court to rehear this case in light of the new legislation and enter a new decision reversing the district court and holding that the Social Security Administration is not subject to an income deduction order that requires payment of a debtor's social security benefits to the trustee in bankruptcy.

The May 13, 1983 decision of this court was based on the law in effect when the district court affirmed the bankruptcy court's order. If the amended social securi-

ty act alters the obligations of the parties, then a proper motion should be made to the bankruptcy court requesting relief from its previous income deduction orders.

With this clarification of the opinion, it is ordered that the appellant's petition for rehearing filed in the above entitled and numbered cause be and the same is hereby

DENIED.

**Johnny Paul WITT, Petitioner,**

v.

**Louie L. WAINWRIGHT, etc., et al., Respondents.**

No. 81–5750.

United States Court of Appeals, Eleventh Circuit.

Sept. 16, 1983.

As Amended on Denial of Rehearing and Rehearing En Banc Jan. 4, 1984.*

---

* Opinion denying rehearing and correcting opinion, 723 F.2d 769.

William C. McLain, Asst. Public Defender, Tenth Judicial Circuit, Bartow, Fla., for petitioner.

Robert J. Landry, Asst. Atty. Gen., Tampa, Fla., for respondents.

Before RONEY and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

Johnny Paul Witt appeals from the district court's denial of his petition for a writ of habeas corpus. Petitioner was convicted of first degree murder in Florida and sentenced to death. In this appeal, he challenges the district court's determination of his claims regarding: (1) the admission into evidence of inculpatory statements rendered after he requested an attorney; (2) the Florida Supreme Court's alleged use of non-record material in reviewing his sentence; (3) the admission into evidence during the penalty phase of petitioner's trial of testimony by psychiatrists to whom petitioner had made inculpatory statements during a competency and sanity examination; (4) the trial court's reliance upon non-statutory aggravating circumstances in the sentencing order; and (5) the excusal of three prospective jurors for cause based upon their opposition to the death penalty.

We find, after a thorough review of the entire record, that the district court properly disposed of the first four of petitioner's claims listed above. We are unable to agree with the district court, however, that the trial court did not commit error of constitutional dimension when it dismissed for cause a prospective juror who expressed

her opposition to the death penalty, but who failed to indicate her unequivocal inability to apply the law as charged. This error mandates our reversal of the district court's decision denying petitioner's request for resentencing.

## I. BACKGROUND

Petitioner was convicted of first degree murder for the October 28, 1973, killing of 11 year old Jonathan Kushner. Witt, then 30 years old, was bow and arrow hunting with his younger friend, Gary Tillman. The two apparently had spoken about killing a human on other occasions and even had stalked persons like animal prey.

On the day of the murder, Witt and Tillman were hunting in a wooded area near a trail often used by children. Tillman apparently struck the victim, who was riding his bicycle along a path through the area, on the head with a star bit from a drill. At that point, Witt assisted Tillman in gagging Kushner and placing him in the trunk of Witt's car. Petitioner and Tillman then drove to a deserted grove and opened the car trunk. The victim was dead, as a result of suffocating from the gag. The two dug a grave for the Kushner boy and then slit his stomach so it would not bloat. Before burying the victim, Witt and Tillman performed various acts of sexual perversion and violence to Kushner's body.

Defendant was found guilty of first degree murder, Fla.Stat.Ann. 782.04(1) (West Supp.1982), after a jury trial. On February 21, 1974, Witt was sentenced to death, in accordance with the jury's recommendation, by the Circuit Court for the Seventh Judicial District for Volusia County, Florida. The Florida Supreme Court affirmed that decision on direct review. *Witt v. State,* 342 So.2d 497 (Fla.), *cert. denied* 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294, *reh. denied* 434 U.S. 1026, 98 S.Ct. 755, 54 L.Ed.2d 774 (1977). Petitioner then moved to vacate, set aside, or correct the sentence under Fla.R.Crim.P. 3.850. His motion was denied. The Florida Supreme Court affirmed this decision. *Witt v. State,* 387 So.2d 922 (Fla.), *cert. denied,* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980).

Petitioner sought federal habeas relief from the United States District Court for the Middle District of Florida. That court denied Witt's petition initially and, after an evidentiary hearing on the *Witherspoon* issue, affirmed its prior memorandum decision. Petitioner filed a notice of appeal on June 24, 1981. After hearing oral argument in this case, we deferred consideration pending the decision in this Court's *en banc* case, *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983), which addresses several issues we face here. We now proceed to a consideration of Witt's claims.

## II. THE *MIRANDA* ISSUE—ADMISSIBILITY OF PETITIONER'S CONFESSION

■ Petitioner was arrested during the afternoon of November 5, 1973. The district court found the following sequence of events transpired. Witt was given the standard *Miranda* warning and brought to the county jail where he was interrogated simultaneously by sheriff's deputies, an FBI agent, and an assistant state prosecutor. Petitioner requested an attorney soon after the questioning began. The interrogation at that point properly ceased.

Witt was left in the interrogation room under the custody of Lt. Arnie Myers of the Hillsborough County Sheriff's Department. Lt. Myers testified that petitioner began to complain about the interrogation. Myers claims he cut off Witt's discussion by informing Witt that he was not authorized to discuss the Kushner case. Witt apparently then asked Myers if all of the sheriff's murder cases were solved, and Myers responded by asking which case Witt had in mind. Witt told Myers that Tillman, his co-defendant, possibly had information on the murder of a young girl named Gail Joyner. Myers' interest was piqued because he was working on the Joyner investigation at the time. Soon after the statement, officers arrived to take Witt to his prison cell for the night. Myers testified that Witt said he would like to continue

their discussion the next day, presumably referring to the Joyner case.

On the next day, November 6, Witt had his first appearance before a county judge. Witt was represented by an attorney from the public defenders' office. It is unclear, however, whether petitioner actually consulted with the attorney, even though he requested such an opportunity. On November 7, Myers went to Witt's cell in the early morning to continue their discussion from two days previously. On the way to the interrogation room, Myers read petitioner his rights in accordance with routine police procedures.

Upon arriving at the interrogation room, Witt asked Myers if he had spoken to Tillman yet. Myers responded that he had not, but that someone else had. Witt then asked what Tillman said, to which Myers answered he did not know. Petitioner then was silent for awhile, according to Myers, until he stated that his co-defendant would probably attempt to pin the blame upon him, apparently referring to the Kushner, and not the Joyner, case.

Witt asked Myers for paper and pen, which Myers provided, along with a waiver of rights form. Myers read this waiver form and asked Witt if he understood its contents; Witt responded affirmatively. Myers testified that reading the waiver form was routine police procedure when giving a prisoner writing materials during a questioning session. Witt then wrote out a 13 page confession over the course of several hours. Agent Fred Barnesdale, also of the Hillsborough County Sheriff's Department, joined Myers at some point while Witt was writing his confession. Barnesdale asked Witt several questions that secured Witt's cooperation in revealing the locations of various aspects of the crime. Witt also tendered an oral confession during the course of November 7. Petitioner's motion to suppress his confession was denied by the trial court on February 12, 1974.

Petitioner contends that his confession was extracted in violation of the constitutional principles set forth in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona,*

451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Petitioner argues that the waiver of his right to counsel, while perhaps voluntary, was not intelligent and knowing. He urges that the initiation by the police of further custodial interrogation after he had unambiguously expressed his desire to consult with an attorney constituted improper coercion. Petitioner concludes that his confession and all evidence stemming from it were inadmissible as violative of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel.

In *Miranda,* the United States Supreme Court made it clear that the government must show by a "heavy burden" that a waiver of these constitutional rights was voluntary, knowing, and intelligent. 384 U.S. at 475, 86 S.Ct. at 1628. The *Miranda* doctrine requires that:

> An uncounseled confession may not be introduced into evidence against a criminal defendant unless the government can sustain its "heavy burden" of proving that the defendant has waived his right against self-incrimination and his concomitant right to the presence of counsel and that his waiver was "voluntary, knowing and intelligent."

*Nash v. Estelle,* 597 F.2d 513 (5th Cir.1979) (en banc), *quoting Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628. In *Edwards,* the Court clarified the rights of an accused person held in custody who has expressed his or her desire to speak with an attorney. The Court stated:

> [A]n accused . . ., having expressed his desire to deal with the police only through counsel, is not subject to further investigation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484–85, 101 S.Ct. at 1884–85.

The district court originally relied upon the state court's finding that Witt expressed his desire to confess during a "casual conversation" in his cell on the morning of November 7. Soon after the district court entered its initial memorandum deci-

sion, the Supreme Court issued *Edwards v. Arizona.* The district court commendably decided to hold an evidentiary hearing on the *Miranda* issue, in light of *Edwards,* and reconsidered its initial decision. The court frankly admitted that there was scant record support for the state court's conclusion, upon which the district court had relied. The district court concluded, however, that Witt initiated further contacts with the police after his request for an attorney and that his Fifth and Sixth Amendment rights were therefore not violated.

We find, at the outset of our analysis, that there is no merit to the State's argument that petitioner's right to an attorney had not yet attached at the stage of custodial interrogation being challenged. Petitioner indisputably was entitled to the assistance of counsel after his first appearance before the county judge on November 6. *See Brewer v. Williams,* 430 U.S. 387, 388–89, 97 S.Ct. 1232, 1234–35, 51 L.Ed.2d 424 (1977).[1]

The district court's finding that petitioner made a voluntary, knowing, and intelli-

gent waiver of his right to counsel before his confession depended on credibility choices. Witt's testimony conflicted dramatically with that of Myers. The court explicitly credited Myers' testimony. This decision is binding upon our Court absent clear error. Based upon a consideration of the totality of the circumstances surrounding petitioner's confession, we conclude that there is sufficient evidence on the record to support the district court's determination of the confession's admissibility.

Testimony at the federal habeas evidentiary hearing indicates that Witt initiated the November 5 discussion with Myers about the Joyner case. The testimony also supports the conclusion that Myers initiated the discussion on the morning of November 7 to follow-up their discussion of two days earlier, at Witt's invitation, and with the genuine belief that Witt intended to discuss the Joyner investigation and not the murder involved in this action.[2] Therefore, Myers' questioning of Witt on November 7 was not impermissible.

Q: And I believe you testified that he asked you to come back to talk to you again, not about the Kushner case, but about the Joyner case; is that correct?

A: He didn't specify. He just said—we ended up talking about Gail Joyner, and he said, "Come get me tomorrow; we can finish this conversation."

Q: But it was your belief he wanted to talk about the Joyner case?

A: Yes sir.

The state offered into evidence at the evidentiary hearing a "Continuation Report" written by Lt. Myers on November 5, shortly after his first encounter with petitioner. That report materially contradicts Myers' version of the facts as recounted during his oral testimony. Myers wrote:

I sat silently, suddenly Mr. Johnny Paul Witt related that he find [sic] it difficult to talk to police officers. He qualified that statement by saying: "I don't have that problem with someone like you" "from an oppressed group." [Lt. Myers is a black male]. I again advised Johnny Witt that I didn't want to question him in reference to the Kushner case. I stated that if he wanted to talk with someone I would get the officer who originated this report back into the interrogation room, he said no I don't trust them, etc. I advised Johnny Witt that I didn't know much about it, the disappearance of Jonathon [sic] Kushner. We were

1. It is unnecessary, for the disposition of this issue, for us to consider petitioner's right to counsel on November 5, although we are inclined to believe that the guarantees acknowledged in *Brewer* should be afforded to petitioner on that date as well.

2. Myers' testimony in this regard, on direct examination, was as follows:

Q: So he asked you to come back and visit him the next day so he could conclude his discussion about the Joyner case?

A: Yes sir.

   .    .    .    .    .

Q: Okay. Now at the conclusion of that meeting on November 5, was it Mr. Witt who suggested that you come back and talk to him some more about the Joyner case?

A: Yes.

   .    .    .    .    .

Q: Now, what was your purpose for going to see Mr. Witt on November 7?

A: I felt pretty certain that he would do what he said and help me on the Gail Joyner case, and I felt that with the information that he could provide, I could subsequently talk to Mr. Tillman and shed some light on the Gail Joyner case.

Myers testified on cross-examination as follows:

The record also fairly supports the conclusion that it was petitioner who initiated discussion of the Kushner case on November 7. Myers read Witt his rights in accordance with routine police procedure. Witt decided to confess on his own, with no apparent prompting or coercion by the police, and only after he had been informed of his rights two times, the second with every indication of careful regard for Witt's genuine understanding. The introduction of questions by Agent Barnesdale about the location of certain acts of the crime did not result in any qualitative difference in petitioner's custodial interrogation. We do not find that Barnesdale extended the subject matter of inquiry beyond those categories already broached by petitioner's voluntary acts.

We are unable to conclude, as petitioner suggests, that the Hillsborough police ignored Witt's repeated requests for an attorney. The record clearly indicates otherwise. Nor do we find that the police so wore petitioner down, through various pressure tactics and lack of sleep, that his confession was for all practical purposes coerced. The only support for these allegations comes from the testimony of petitioner himself, which the district court found as undeserving of credence. There is no reliable evidence of bad faith in Witt's treatment by the police.[3]

In sum, we conclude that the district court did not err in concluding that petitioner knowingly, intelligently, and voluntarily waived his right to an attorney and his privilege against self-incrimination. Lt. Myers merely followed up on a line of inquiry opened up by Witt himself. Witt later chose, albeit unwisely from his perspective, to extend his discussions with Myers beyond the initial subject matter to encompass the murder of the Kushner child. No constitutional principles are violated by the admission into evidence of petitioner's confession.

## III. THE *BROWN* ISSUE—NON–RECORD MATERIAL BEFORE THE REVIEWING COURT

■ Petitioner argues that the Florida Supreme Court relied on non-record infor-

---

silent again for a short period when Johnny Witt broke the silence by asking; "have yau'll [sic] solved all your murder cases?", I said, "which one do you have in mind?" At this point I suggested to Johnny Witt that if there was something he wanted to talk about to wait until after he had first talked with his attorney. He stated he didn't have any money, I told him the courts would appoint one free, without cost. At this point I went through the complete procedure (constitutional rights) based on the Mirander [sic] decision. Johnny Witt stated that if I had just one more day, I would have turned myself in. He interrupted his school of thought by saying "maybe Gary can tell you something about these unsolved murders, I would like to help you. [sic] I stated that I didn't know of any [sic] he asked, "what about the girl with the raccoon" [the Joyner case]. I said, do [sic] Gary know about that?" He stated, "ask him, he probably do" [sic].

I stated to Mr. Witt that I would talk to Gary Tillman whenever I got the opportunity. I asked Mr. Johnny Witt has he hunted in the area before, *this was in reference to where Jonathon [sic] Kushner disappeared.* ... Johnny Witt stated he was out there approx. two weeks prior to the Kushner deal. *I asked him was there any kids out there playing,* he said yes, in fact, I ran a little girl away from the area I was in, I told her she might get hurt, to leave. *I asked him was he alone,* he stated that he was, and that he was driving a yellow car. At this point he asked for more coffee, and I responded as I had earlier. When I returned with the coffee Johnny Witt stated he couldn't think very well, but would talk with me later. At this point our conversation terminated. (Emphasis added).

This account of Myers' first encounter with Witt indicates that it was *Myers* who initiated the discussion of the murder in the instant action, after Witt had requested an attorney. We cannot escape the fact that the district court had this testimony before it when it rendered its opinion. The court chose to credit Myers' oral testimony in reconstructing the facts surrounding Witt's confession. Since there is substantial support on the record for the district court's account of the facts, we are unable to find that the district court clearly erred in this regard. The result of this conclusion is that Myers' written Continuation Report has no bearing on our *Miranda* analysis.

3. There is no indication here that the repeated recitation of *Miranda* warnings, in the face of Witt's unambiguous and repeated requests for an attorney, was anything but routine police procedure designed to comply with constitutional dictates.

mation, such as psychiatric and pre-sentence investigation reports, in the direct review of his conviction and sentencing. Petitioner claims that this practice infringed on his constitutional guarantees including the right to due process of law, the effective assistance of counsel, confrontation, freedom from cruel and unusual punishment, and the protection against compelled self-incrimination.[4] He argues that the use of this material runs afoul of the principles of *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (petitioner was denied due process when death sentence was imposed, at least in part, on the basis of information that he had no opportunity to deny or explain).

The en banc court in *Ford v. Strickland,* 696 F.2d 804 (11th Cir. Jan. 7, 1983) (en banc), denied an identical claim in that action. The *Ford* court relied upon the Florida Supreme Court's opinion in *Brown v. Wainwright,* 392 So.2d 1327, *cert. denied,* 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981),[5] to conclude that:

> Even if members of the [Florida Supreme C]ourt solicited the material with the thought that it should, would or might be used in the review of capital sentences, the decision of the Florida court that it should not be so used, the statement that it was not used, and the rejection of the notion that it affected the judgment of the court ends the matter when addressed at the constitutional level.

*Ford v. Strickland,* 696 F.2d at 811. Due to the absence of any indication contrary to the above statement in the instant action, we must deny petitioner's *Brown* claim.

## IV. THE *SMITH* ISSUE—ADMISSIBILITY OF PENALTY PHASE PSYCHIATRIC TESTIMONY

■ After reviewing petitioner's military medical records and reports from two court-appointed psychiatrists who examined petitioner, the trial court determined on January 8, 1974, that Witt was competent to stand trial. The court-appointed psychiatrist examined petitioner without warning him that anything he said could be used against him in court. One of the psychiatrists, however, informed Witt that he had a choice whether to submit to the examination. The psychiatrists later testified, during the penalty phase of petitioner's trial, that Witt had an incurable propensity to commit future violent crimes, that he was a menace to society, and that he was a sexual pervert. The trial judge explicitly relied on some of these factors in reaching his sentencing decision.

Petitioner argues that his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel were violated by use of this psychiatric testimony where the psychiatrist failed to warn petitioner that the results of the examination would be used against him in court and that he had the right to remain silent. After the district court issued its decision in this case, but before petitioner's motion to alter, amend, or set aside the judgment, the Supreme Court issued its decision in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In *Smith,* the Court squarely held that use of such psychiatric testimony, secured without adequate warnings to the defendant in the context of a limited and neutral competency examination, constitutes a violation of that defendant's Fifth and Sixth Amendment rights when used by the state during the sentencing phase.

Were petitioner's claims so straightforward, we would not hesitate to find *Smith* controlling. The district court, however, identified three distinctions between *Smith* and the instant action. First, the evidence adduced was not probative as to any of the statutory aggravating circumstances the

---

**4.** Petitioner alleges violations of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

**5.** *Brown v. Wainwright* was a direct petition for writ of habeas corpus by 123 Florida death row inmates alleging the same facts of the solicitation of non-record materials during the pendency of their capital case appeals. The Florida Supreme Court denied class relief.

sentencer was entitled to consider, as was the evidence in *Smith* under Texas law. Second, the defendant, rather than the trial judge, requested the competency examination. Third, the defendant allowed the psychiatrist to testify for his own tactical reasons and thereby waived any objection to such testimony.

It is irrelevant who actually requested the examination, where it was conducted for the limited purpose of assessing petitioner's competency to stand trial. Also, whether the psychiatric evidence adduced at the sentencing phase supported a proper statutory aggravating circumstance or not, the fact remains that this prejudicial information was still considered. Despite these areas of disagreement with the district court's decision, we affirm the district court's disposition of this issue. Petitioner's trial attorney did not object to introduction of the psychiatric evidence. Testimony by Witt's attorney clearly indicates that petitioner would have called the psychiatrist to testify during the sentencing phase of his trial had the state failed to do so. Petitioner's failure to object was purely tactical and did not, as Witt suggests, result from his unawareness that the state would use such evidence or from his improper assessment of how damaging the testimony would ultimately prove to be.

The Supreme Court in *Smith* recognized that the rule there stated should not invalidate sentences such as the one in this case. The Court noted that, "a different situation arises where a defendant intends to introduce psychiatric evidence at the penalty phase . . ." 451 U.S. at 472, 101 S.Ct. at 1878. Since petitioner is unable to show cause to qualify for exception from the procedural default bar of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), we find that Witt has failed to state a meritorious *Smith* claim.

### V. CONSIDERATION OF NON–STATUTORY AGGRAVATING CIRCUMSTANCES

This issue has now been decided adversely to Witt by the Supreme Court in *Wainwright v. Goode,* — U.S. —, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983).

### VI. THE *WITHERSPOON* ISSUE—PROPRIETY OF PROSPECTIVE JURORS' EXCUSAL FOR CAUSE

During the jury selection at petitioner's trial, the court excused 11 venirepersons for cause because they expressed opposition to the death penalty. Petitioner urges that three of these dismissals were unconstitutional under the standards set forth by the Supreme Court in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[6]

In *Witherspoon,* the Supreme Court acknowledged that a capital defendant's right to an impartial jury under the Sixth and Fourteenth Amendments is jeopardized by the removal of jurors who merely express their distaste for or philosophical opposition to the death penalty. A jury constituted of only those remaining after such excusals would be a jury "uncommonly willing to condemn a man to die." *Witherspoon,* 391 U.S. at 521, 88 S.Ct. at 1776. Yet the Court recognized the necessity of excusing for cause those prospective jurors who, because of their lack of impartiality from holding unusually strong views against the death penalty, would frustrate a state's legitimate effort to administer an otherwise constitutionally valid death penalty scheme. The Court resolved these conflicting principles by permitting a state to:

> execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakeably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Witherspoon,* 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21 (emphasis in original).

The Court, in explaining this test, has indicated a prospective juror must be permitted great leeway in expressing opposition to the death penalty before he or she qualifies for dismissal for cause. A prospective juror may even concede that his or her feelings about the death penalty would possibly color an objective determination of the facts of a case without admitting of the necessary partiality to justify excusal. The Court has stated:

> Nor [does] the Constitution permit the exclusion of jurors from the penalty phase of a . . . murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if

---

**6.** The *Witherspoon* standards are applied to bifurcated death penalty trials of the type in this action in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

they are convinced, beyond reasonable doubt, but not otherwise, *yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be reasonable doubt.* Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law. *Adams,* 448 U.S. at 50, 100 S.Ct. at 2529 (emphasis added).

7. *Davis v. Georgia,* 429 U.S. 122, 123, 97 S.Ct. 399, 400, 50 L.Ed.2d 339 (1976).

8. Prospective juror Gehm engaged in the following colloquy on voir dire:

Mr. Plowman: I am asking you [to] consider ... aggravating circumstances ... would you be able to follow that and come back with a death penalty conviction?

. . . . .

Mr. Gehn: I am afraid not, sir.
Mr. Plowman: You would not be able to do so?
Mr. Gehm: My religious convictions would be foremost in my mind up to this point and possibly beyond that.
Mr. Plowman: Okay.
Mr. Gehm: I am afraid I would be unable to.

. . . . .

Mr. Behuniak [for petitioner]: I am saying if you were to return a verdict of guilty of first-degree murder, could you keep an open mind as to whether you should vote for the death penalty or life?
Mr. Gehn: No, I could not.
Mr. Behuniak: Why is that, sir?
Mr. Gehn: I feel that the Almighty is the Judge of life or death.
Mr. Behuniak: That's right. You said that previously. But you would not let it interfere with your determination?
Mr. Gehn: I am afraid that it would be weighing on my mind during the trial.
Mr. Plowman: Your Honor, the state would move to dismiss for cause at this time.
The Court: Do you think that this state of mind will prevent you from acting with impartiality? Do you feel that the state of mind that you have will prevent you from acting with impartiality? What I am saying is—
Mr. Gehn: I am afraid it might, sir.
The Court: You are afraid so?
Mr. Gehn: I am afraid it might, sir.
The Court: Okay. Step down.
The statement by venireperson Gehm, that he "could not" keep an open mind in sentencing, is far less equivocal than any responses proffered by Ms. Colby.

In the instant action, petitioner challenges the excusal of venirepersons Colby, Gehm, and Miller as unjustified under the *Witherspoon* standard. The relevant portions of the voir dire of these jurors indicate that the inquiry of prospective juror Colby arguably adduced the *least* certain statement of inability to follow the law as instructed. Because we are compelled to reverse petitioner's sentence, if we find a *Witherspoon* violation with respect to a single prospective juror,[7] we shall limit our consideration to the dismissal of Ms. Colby, the most persuasive instance of a *Witherspoon* violation of the three excusals cited by petitioner.[8]

Prospective juror Miller responded to questions on his views about the death penalty as follows:
Mr. Plowman: Okay. Did you hear the discussion that we have had just recently with Mrs. Davis regarding the death penalty?
Mr. Miller: That's right.
Mr. Plowman: Okay. Do you have any strong feelings one way or the other regarding the death penalty?
Mr. Miller: Well I just couldn't bring a—I couldn't vote, I guess, well, I am against the death penalty.
Mr. Plowman: You are against the death penalty? Would that interfere with your determination in this case?
Mr. Miller: I think it would.
Mr. Plowman: Okay. And you wouldn't be able to follow the law as instructed by the Court?
Mr. Miller: When it comes down to a death verdict, I wouldn't.
Mr. Plowman: You could not do it. Okay. Regardless of the law?
Mr. Miller: No, sir.
Mr. Plowman: Okay. Your Honor, the State would move the Court to excuse Mr. Miller for cause.
The Court: Do you feel because of your state of mind regarding that particular situation it would make you unable to render a just and fair verdict in this case?
Mr. Miller: I am against the death verdict. I think it would.
The Court: Step down.
Prospective juror Miller as well offered less ambiguous responses than Ms. Colby and did not merely engage in a discussion of his feelings. He quite firmly indicated that he "wouldn't" be able to follow the law as instructed by the court and that he "could not" register a vote for the death penalty, "regardless of the law."

We therefore limit our consideration to the responses provided by prospective juror Colby and do not reach the question of the constitutionality of the for cause excusals of Gehm and Miller.

The following voir dire led to prospective juror Colby's dismissal:

Mr. Plowman [for the State]: Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?

Ms. Colby: I am afraid personally but not—

Mr. Plowman: Speak up, please.

Ms. Colby: I am afraid of being a little personal, but definitely not religious.

Mr. Plowman: Now, would that interfere with you sitting as a juror in this case?

Ms. Colby: I am afraid it would.

Mr. Plowman: You are afraid it would?

Ms. Colby: Yes, sir.

Mr. Plowman: Would it interfere with judging the guilt or innocence of the defendant in this case?

Ms. Colby: I think so.

Mr. Plowman: You think it would?

Ms. Colby: I think it would.

Mr. Plowman: Your Honor, I would move for cause at this point.

THE COURT: All right. Step down.

Prospective juror Colby's responses are limited to expressions of her feelings and her thoughts on the subject of inflicting the death penalty. At no point did she unequivocally state that she would automatically be unable to apply the death penalty or to find petitioner guilty if the facts so indicated. Her statements fall far short of the certainty required by *Witherspoon* to justify for cause excusal. Perhaps her responses are so devoid of the necessary certainty because of the State's failure to frame its questions in an appropriately un-

ambiguous manner. The State inquired whether Ms. Colby's fears about applying the death penalty would "interfere" with her sitting as a juror in petitioner's case without ever attempting to directly ask those questions the *Witherspoon* standard seems to require. The word "interfere" admits of a great variety of interpretations, and we would find it quite unnatural for a person, who has already expressed her concern about the death penalty, to respond otherwise than that her feelings would "interfere" with, "color," or "affect" her determinations. Such a response does not indicate an inability, in all cases, to apply the death sentence or to find the defendant guilty where such a finding could lead to capital punishment because it fails to reflect the profundity of any such "interference." We therefore find that venireperson Colby was improperly excused for cause and that petitioner is entitled to be resentenced as a result of this violation of his constitutional rights.[9]

The reversal of petitioner's sentence on the basis of venireperson Colby's excusal is mandated by two cases from this Circuit of notable factual similarity. In *Granviel v. Estelle,* 655 F.2d 673 (5th Cir.1981), the Court evaluated a voir dire in which the prospective juror was asked if he could ever vote to inflict the death penalty. He replied, "No, I don't think I could." Then, in response to the question, "You just don't feel like you would be entitled to take another person's life in that fashion?" He nodded and then said, "No, I could not." The Court found that, "[t]hese questions and answers fall far short of an affirmation

---

**9.** Appellees urge us to dismiss petitioner's claim on procedural grounds. The state argues that Witt waived his right to bring this claim in federal habeas court, under *Sykes,* by failing to object at trial. Appellees invite our attention to *Paramore v. State,* 229 So.2d 855 (Fla.1969), *vacated on other grounds,* 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972), which they claim establishes a state rule requiring a defendant to indicate his or her desire to keep a challenged juror and to attempt to "qualify" that juror during the voir dire.

The *Sykes* procedural bar is inapplicable to petitioner's claim because the fact that the Florida Supreme Court on direct appeal considered appellant's *Witherspoon* claim on the merits, *Witt v. State,* 342 So.2d at 499, establishes the absence of a state contemporaneous objection rule prohibiting consideration of the propriety of a juror's excusal for cause where an objection was not registered during the trial

proceedings. *See Henry v. Wainwright,* 686 F.2d 311, 313 (5th Cir. Unit B) ("If Florida law dealt with the merits of Henry's objection, whether or not there was a procedural default at trial under state law, then a federal habeas court must also determine the merits of the claim. *Lefkowitz v. Newsome,* 420 U.S. 283, 292 n. 9, 95 S.Ct. 886, 891 n. 9, 43 L.Ed.2d 196 (1975); *Ratcliff v. Estelle,* 597 F.2d 474, 478 (5th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979)."), *petition for cert. filed,* No. 82–840 (Nov. 17, 1982); *Moran v. Estelle,* 607 F.2d 1140 (5th Cir.1979). *Also see County Court of Ulster County v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979) (when the state courts do not indicate that a "federal constitutional claim is barred by some state procedural rule, a federal court implies no disrespect for the State by entertaining the claim."); *Booker v. Wainwright,* 703 F.2d 1251 (11th Cir.1983).

by [the prospective juror] that he would automatically vote against the death penalty regardless of the evidence, or that his objections to capital punishment would prevent him from making an impartial decision as to guilt." 655 F.2d at 677. Similarly, in *Burns v. Estelle,* 626 F.2d 396 (1980), the former Fifth Circuit *en banc* found that the *Witherspoon* test was not met where a prospective juror merely acknowledged that the presence of the death penalty would "affect" her deliberations. These cases turn on facts substantially similar to both types of answers provided by Ms. Colby: first, where she expressed her thoughts and feelings about imposing the death penalty; and second, where she admitted that these reservations would impose some level of "interference" with her role as an impartial juror. These cases control our decision that the trial judge erred in excusing Colby for cause.[10]

The State forwards three substantive arguments counseling against a finding of a constitutional violation on these facts. First, appellees claim that any improper excusal was harmless error because the State used only two of its 10 available peremptory challenges. The State suggests it would have challenged juror Colby even if the court failed to remove her for cause. Appellees attempt to distinguish the panel opinion in *Burns v. Estelle,* 592 F.2d 1297 (5th Cir.1979), on the facts. In *Burns,* the Court refused to find harmless error where the State had used 13 of 15 peremptory challenges and the petitioner challenged the excusal of four of the prospective jurors. Despite these differences in numbers, the State's argument that there is constitutional significance to the fact that some peremptory challenges remained after the jury was selected must fail under the holding of *Davis v. Georgia,* 429 U.S. 122, 123, 97 S.Ct. 399, 400, 50 L.Ed.2d 339 (1976) (per curiam) (the improper exclusion of even one out of 83 veniremembers was grounds for reversal of a death sentence). *Hance v. Zant,* 696 F.2d at 956.

The State's second argument is that the *Granviel* case, upon which we rely is factu-

ally distinguishable because the venireperson there was asked only about his inability to sentence to death, whereas here the prospective juror was also asked about the effect of her conscientious scruples upon her ability to determine impartially petitioner's guilt or innocence. This argument is unpersuasive because, while we are bound by *Granviel* as to the first prong of the inquire, *Burns* controls our determination as to the second—that is whether Mrs. Colby's beliefs would "prevent" her "from making an impartial decision as to the defendant's guilt." *Witherspoon,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original). As discussed above, Mrs. Colby's *"thinking"* her belief would "interfere with judging guilt or innocence" does not change the posture of the case in favor of the disqualification. *Burns v. Estelle, supra* at 398.

Appellees finally urge that this Court avoid imposing the *de facto* requirement that prosecutors ask each prospective juror certain standard questions and receive "talismanic" answers before excusal for cause may be justified. Appellees also argue that we should refrain from following the *Granviel* case to the extent that it imposes a per se rule that a prospective juror's use of the term "I think," even when taken out of context, constitutes inadequate grounds for excusal. We agree that no such rule exists in this Circuit. In our reading of *Granviel,* we find no indication that the Court considered the prospective juror's use of the phrase "I think" as anything but a part of the total circumstances of the voir dire, although a justifiably important part. The decision in this appeal likewise countenances a review of the totality of the circumstances of the voir dire and does not require that the venireperson utter a pat phrase, the incantation of which magically frees the power of excusal from its yoke of unconstitutionality.

## VII. CONCLUSION

We therefore affirm the district court's decision with respect to the first four issues

---

**10.** The current uncertainty in our Circuit over the degree of deference under 28 U.S.C. § 2254(d) to be accorded to a trial court's finding of cause, *see Darden v. Wainwright,* 699 F.2d 1031 (11th Cir.1983), *vacated* on reh. en banc, at 1043 (April 6, 1983); *Hance v. Zant,*

696 F.2d 940 (11th Cir., Jan. 24, 1983) is immaterial to our disposition of appellant's claim. We are convinced that the trial court erred in finding cause for excusal in this instance under even the least rigorous standard of appellate review.

evaluated on this appeal. We reverse the district court's decision on the *Witherspoon* issue and remand to that court for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

RONEY, Circuit Judge, specially concurring.

Since I am not prepared to agree that this Court's decision in *Goode v. Wainwright,* 704 F.2d 593 (11th Cir.1983) retains its viability in light of *Stephens v. Zant,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), and *Barclay v. Florida,* —— U.S. ——, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), I concur only in the result reached by the Court. Since this case is distinguishable from *Goode,* it matters not to this decision how these Supreme Court decisions may have detracted from the *Goode* analysis.

Although I doubt the soundness of the analysis which leads to the reversal under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), I recognize the Court's attempt to faithfully follow the decisions in this Circuit which, although questionable, guide that analysis and I therefore do not dissent.